1  Richard Sax SBN 80632  *Richard@rsaxlaw.com*
   **LAW OFFICES OF RICHARD SAX**
2  448 Sebastopol Avenue
   Santa Rosa, CA. 95401
3  Telephone: (707) 525-1824
   Facsimile: (707) 525-8119
4
5  Attorney for Plaintiff RYAN L. HOBBS

6

7
                    **UNITED STATES DISTRICT COURT**
8                 **NORTHERN DISTRICT OF CALIFORNIA**

9

10  RYAN L. HOBBS,                          C NO: 07 3854

11                  Plaintiff,

12                                          **COMPLAINT FOR DAMAGES FOR**
                                            **FRAUDULENT REPRESENTATION;**
13     v.                                   **FRAUDULENT CONCEALMENT;**
                                            **PRODUCTS LIABILITY—**
14  PURDUE PHARMA COMPANY;                  **NEGLIGENCE; STRICT PRODUCTS**
    PURDUE PHARMA L.P.; PURDUE              **LIABILITY: FAILURE TO WARN;**
15  PHARMA, INC.; THE PURDUE                **BREACH OF IMPLIED WARRANTY**
16  FREDERICK COMPANY; PURDUE               **OF MERCHANTABILITY; BREACH**
    PHARMACEUTICALS L.P.;                   **OF IMPLIED WARRANTY OF**
17  PHARMACEUTICAL RESEARCH                 **FITNESS FOR PARTICULAR**
18  ASSOCIATES, INC.; PURDUE                **PURPOSE; BREACH OF EXPRESS**
    PHARMA LTD.; P.F. LABORATORIES,         **WARRANTY OF FITNESS FOR**
19  INC.; and ABBOTT LABORATORIES           **PARTICULAR PURPOSE; STRICT**
20  INC.,                                   **LIABILITY IN TORT**

21                  Defendants.             **DEMAND FOR JURY TRIAL**

22

23

24  //
25  //
    //
26  //
27  //
    //
28

                                    1
                                COMPLAINT

1

**INTRODUCTION**

2      1.      This is an action for damages against Defendants PURUDE PHARMA
3    COMPANY; PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE
4    FREDERICK COMPANY; PURDUE PHARMACEUTICALS L.P.; PHARMACEUTICAL
5    RESEARCH ASSOCIATES, INC.; PURDUE PHARMA LTD.; P.F. LABORATORIES,
6    INC.; and ABBOTT LABORATORIES INC., for Fraudulent Representation; Fraudulent
7    Concealment; Products Liability—Negligence; Strict Products Liability—Design
8    Defect; Strict Products Liability: Failure to Warn; Breach of Implied Warranty of
9    Merchantability; Breach of Implied Warranty of Fitness for Particular Purpose;
10   Breach of Express Warranty of Fitness for Particular Purpose; Strict Liability in Tort.

11

12

**JURISDICTION**

13      2.      This court has jurisdiction of this matter in accordance with 28 USC
14   1332(a)(1) in that this is a civil action between citizens of different states and the
15   amount in controversy exceeds $75,000, exclusive of interest and costs.

16

**INTRADISTRICT ASSIGNMENT**

17      3.      A substantial part of the events or omissions which give use to the
18   claims herein occurred within the State of California, County of Mendocino.

19

**PARTIES**

20      4.      At all times relevant herein, Plaintiff RYAN L. HOBBS ("Plaintiff") was
21   and now is an adult citizen of the United States, residing in the City of Ukiah, County
22   of Mendocino, State of California.

23      5.      Plaintiff is informed and believes and based thereon alleges that at all
24   times relevant herein, Defendant PURDUE PHARMA COMPANY was and is a
25   General Partnership domiciled in Delaware, that may be served with process by
26   serving their registered agent, Corporation Service Company, 2711 Centerville Road,
27   Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal
28   Rules of Civil Procedure.

6. Plaintiff is informed and believes and based thereon alleges that at all times relevant herein, Defendant PURDUE PHARMA L.P. was and is a Limited Partnership (LP) domiciled in Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

7. Plaintiff is informed and believes and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMA INC. was and is a corporation, duly organized and existing under the laws of the State of New York, that may be served with process by serving their registered agent, Prentice Hall Corporation System, 50 Weston Street, Hartford, Connecticut 06120-1537, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

8. Plaintiff is informed and believes and based thereon alleges that at all times relevant herein, Defendant THE PURDUE FREDERICK COMPANY was and is a corporation, duly organized and existing under the laws of the State of New York, headquartered in Connecticut, that may be served with process by serving their registered agent, Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120-1537, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

9. Plaintiff is informed and believes and based thereon alleges that at all times relevant herein, Defendant PURDUE PHARMACEUTICALS L.P. was and is a Limited Partnership (LP) domiciled in Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

10. Plaintiff is informed and believes and based thereon alleges that at all times relevant herein, Defendant PHARMACEUTICAL RESEARCH ASSOCIATES, INC. was and is a corporation, duly organized and existing under the laws of the State

3
COMPLAINT

1   of Delaware, that may be served with process by serving their registered agent,

2   Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington,

3   Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

4   11.   Plaintiff is informed and believes and based thereon alleges that at all

5   times relevant herein, Defendant PURDUE PHARMA LTD. was and is a corporation,

6   duly organized and existing under the laws of the State of Delaware, that may be

7   served with process by serving their registered agent, Corporation Service Company,

8   2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with

9   Rule 5b of the Federal Rules of Civil Procedure.

10   12.   Plaintiff is informed and believes and based thereon alleges that at all

11   times relevant herein, Defendant P.F. LABORATORIES INC., was and is a

12   corporation, duly organized and existing under the laws of the State of New Jersey.

13   13.   Plaintiff is informed and believes and based thereon alleges that at all

14   times relevant herein, Defendant ABBOTT LABORATORIES INC., was and is a

15   corporation, duly organized and existing under the laws of the State of Delaware, that

16   may be served with process by serving their registered agent, The Corporation Trust

17   Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware,

18   19801, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

19   14.   At all times herein mentioned, all of the Defendants were the agents,

20   servants and employees of all the other Defendants, and at all of said times were

21   acting in the course and scope of their said agency, service and employment.

22   15.   At all times herein mentioned, Defendants, and each of them, were

23   engaged in the pharmaceutical business throughout the United States, including the

24   manufacturing, designing, assembling, compounding, testing, inspecting, packaging,

25   labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,

26   recommending, advertising, promoting, marketing and selling of a prescription opiod

27   pain medication, OxyContin, for sale to and use by members of the general public.

28

4
COMPLAINT

1

2

## COUNT ONE: FRAUDULENT REPRESENTATION
### Ryan L. Ryan Against All Defendants

3

4

5

16.     Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-16 of the within complaint, as though fully set forth herein.

6

7

8

9

17.     In on or about October of 1999, Ryan was involved in an accident while helping his father install a heavy industrial garage door. In the accident, part of the weight of the garage door fell and pushed down on Ryan while he was up on a ladder.

10

11

12

18.     Ryan, who worked in finish cabinetry and carpentry, was left with pain that varied in intensity in relation to his physical activity. Over time the pain persisted.

13

14

15

16

17

19.     In on or about 1999, and many times thereafter, Ryan was treated for the injury to his infraspinatus muscle by Dr. Steven Wirth, his family physican, USCF Pain Clinic, orthopedic physicians from the Spine Center in San Francisco, the Hillside Health Clinic, the Ukiah Valley Medical Center, Dr. Kenneth Light at St. Francis Memorial Hospital, and the Stanford Pain Clinic, among others.

18

19

20

21

22

20.     Ryan was trailed on multiple medications for pain relief, including Vicodin and Darvocet, in an attempt to bring the left subscapular myofascial pain and mid thoracic myofascial pain to manageable levels.    Ryan also underwent physical therapy, botox injections, trigger point injections, and other treatments, according to proof.

23

24

25

26

27

28

21.     Beginning in on or about 2001, according to proof, Ryan was prescribed OxyContin Tablets ("OxyContin"), a powerful prescription drug developed and originally marketed by Defendants, including Purdue Pharma L.P., The Purdue Frederick Company, The P.F. Laboratories, Inc., and The Purdue Pharma Company (collectively, "Purdue" or "Defendants"). OxyContin is the trade name for oxycodone hydrochloride controlled-release tablets, an opioid analgesic drug that

1   releases the narcotic incrementally over 12 hours and contains more oxycodone than
2   short-acting opioids. OxyContin is a Schedule II controlled substance with an abuse
3   liability similar to morphine.

4      22.    When Ryan was prescribed OxyContin, he had no knowledge that it
5   was highly addictive.

6      23.    After being prescribed OxyContin, Ryan developed tolerance to the
7   drug and severe opiate dependency, so that withdrawal symptoms would result if he
8   abruptly discontinued the use of OxyContin, and the true cause of his underlying
9   physiological pain was obscured and could not be properly diagnosed. Ryan's
10   dosage of OxyContin escalated to four 80 mg. tablets daily, despite his attempts to
11   discontinue the drug.

12      24.    Ryan's ensuing addiction to OxyContin made him increasingly
13   dysfunctional and unreliable, resulting in his spending the better part of on or about
14   five years, according to proof, all but immobilized in bed. Ryan's addiction to
15   OxyContin caused suffering in his life and in the life of his family, caused
16   estrangement between Ryan and his spouse and children, and caused estrangement
17   between Ryan and members of his church.

18      25.    Ryan entered Saint Helena Hospital for treatment of chemical
19   dependency on April 13, 2007. At St. Helena Hospital, Ryan learned and appreciated
20   for the first time that he was addicted to OxyContin, the extent of his addiction, the
21   highly addictive properties of OxyContin, and the unsuitability of OxyContin for
22   moderate pain relief. Only his strong motivation, based upon the values of his family,
23   his religious beliefs, and his fear of estrangement from his church and family,
24   allowed him to become free of his addiction to OxyContin.

25      26.    When Defendants, and each of them, manufactured, designed,
26   assembled, compounded, tested or failed to test, inspected or failed to inspect,
27   packaged, labeled, fabricated, constructed, analyzed, distributed, serviced,
28   merchandised, recommended, advertised, promoted, marketed and sold OxyContin,

6
COMPLAINT

1  the Defendants, and each of them, expressly and impliedly represented to members of

2  the general public, including Ryan, that OxyContin was of merchantable quality and

3  safe for the use for which it was intended.

4      27.    On or about May 10, 2007, Defendant Purdue Frederick, a holding

5  company affilitated with Purdue Pharma, pleaded guilty in <u>United States of America</u>

6  <u>v. the Purdue Frederick Company, Inc., et al.,</u> United States District Court for the

7  Western District of Virginia Abingdon Division case No. 1:07CR00029, to a felony

8  criminal charge that it had misbranded OxyContin with the intent to defraud or

9  mislead, a felony under the federal Food, Drug, and Cosmetic Act, 21 U.S.C.A.

10  331(a), 333(a)(2) (West 1999). Purdue was charged with fraudulently claiming to

11  doctors and patients for on or about six years that OxyContin would cause less abuse

12  and addiction than competing short-acting narcotics such as Percocet and Vicodin,

13  although the Food and Drug Administration ("FDA") had allowed Purdue to claim

14  only that it "believed" that OxyContin, because it was time-released and long-acting,

15  might be less prone to abuse. To settle that charge, Defendant Purdue Frederick

16  agreed to pay $600 million in fines and other payments. Judge James P. Jones of the

17  United States District Court put Purdue Frederick on five years' probation.

18      28.    Also on or about May 10, 2007, in the same case, three executives of

19  Purdue, its former president and CEO, former chief scientific officer, and executive

20  vice president and chief legal officer, pleaded guilty as individuals to the

21  misdemeanor charge of misbranding, solely as responsible corporate officers,

22  pursuant to U.S.C.A.  333(a)(1). The three executives agreed to pay a total of $34.5

23  million in fines, and were  sentenced to three years' probation and 400 hours each of

24  community service in drug treatment programs by Judge James P. Jones of the

25  United States District Court.

26      29.    Oxycontin contains time-released doses of the narcotic oxycodone.

27  Purdue claimed that it provided relief of moderate to serious pain for up to 12 hours.

28  Oxycodone is an opoid — that is, a synthetic opiate similar to other opium derivatives

1    such as morphine—and is classified as a Schedule II controlled substance by the Drug
2    Enforcement Agency. Unlike other medications like Percocet that contain oxycodone
3    along with other ingredients, OxyContin's sole ingredient is pure oxycodone, with a
4    large amount in each tablet because of the time-release design.

5        30.    When Purdue applied for various U.S. Patents for controlled release
6    oxycodone medications for the treatment of moderate to severe pain, it claimed that
7    because OxyContin has a controlled release mechanism, it could administer
8    significantly more effective doses of pain medication over time, and the patient only
9    has to use it twice a day. Purude also claimed that, using a four-fold range of dosages
10    (e.g., between 10 mg. and 40 mg.), OxyContin achieves the same clinical results as
11    prior art opioid formulations using an eight-fold range of dosages (e.g., between 10
12    mg. and 80 mg.). Purdue claimed that the "clinical significance" of the four-fold
13    dosage range of the controlled release OxyContin product, as compared to other
14    opioid analgesics, such as morphine, requiring twice the dosage range, was a more
15    efficient titration process, which is the process of adjusting a patient's dosage to
16    provide acceptable pain relief without unacceptable side effects.

17        31.    Purdue characterized the four-fold dosage range of the claimed
18    oxycodone controlled release formulation as a surprising discovery. Purdue
19    repeatedly relied on that discovery to distinguish its invention from other prior art
20    opioids, while using language that suggested the existence of clinical results
21    supporting the reduced dosage range. Purdue made statements implying that an
22    empirical basis existed for its discovery and then failed to disclose that the discovery
23    was based only on insight.

24        32.    Although Purdue admittedly was in fact unable to prove with
25    experimental results that OxyContin was the most efficiently titratable analgesic,
26    OxyContin was approved by the FDA on December 12, 1995. The FDA allowed the
27    company to claim only that it "believed" that the drug, because it was long-acting,
28    might be less prone to abuse than other opioids.

33.     Like morphine, OxyContin is highly addictive, and can produce withdrawal symptoms in patients who use it for only five to seven days. It is Plaintiffs' information and belief, and they therefore allege, that internal Purdue documents indicate that Purdue recognized even before the drug was marketed that it would face stiff resistance from doctors who were concerned about the potential of a high-powered narcotic like OxyContin to cause addiction. As a result, certain Purdue officials developed a fraudulent marketing campaign designed to promote OxyContin as a time-released drug that would cause less abuse and addiction than competing short-acting narcotics such as Percocet and Vicodin.

34.     Shortly after its introduction, OxyContin became Purdue's best selling and most profitable product. From January 1996 through June 30, 2001, Purdue received approximately $ 2.8 billion in revenue from the sale of OxyContin.

35.     A so-promotion agreement between Purdue and Abbott Laboratories and Abbott Laboratories, Inc. ("Abbott") provided for the sharing of promotion obligations and the payment by Purdue to Abbott of a commission on net sales.

36.     It is Ryan's information and belief, and he therefore alleges, that Purdue has a history of downplaying the risks associated with prescribing OxyContin to medical providers and to the general public, including the risks of dependence, tolerance, overdose, and severe withdrawal symptoms. Therefore, Ryan's physician did not have adequate information when he wrote the initial prescription.

37.     It is Ryan's information and belief, and he therefore alleges, that he and his physician were misled with respect to all the risks associated with taking OxyContin, that the signs of abuse and addiction were never emphasized, and that the need for a tapered withdrawal from the drug was not emphasized by Purdue.

38.     It is Ryan's information and belief, and he therefore alleges, that Purdue initially contended that OxyContin, because of its time-release formulation, posed a lower threat of abuse and addiction to patients than do traditional, shorter-acting painkillers such as Percocet or Vicodin.

1    39. Purdue misbranded OxyContin, fraudulently and deceptively
2  represented OxyContin, and dishonestly marketed the pain pill by failing to tell
3  doctors, pharmacists and patients about the drug's addictive qualities. Purdue
4  marketed OxyContin to medical providers and to the general public in the most
5  aggressive marketing campaign ever undertaken by a pharmaceutical company for a
6  narcotic painkiller. Purdue heavily promoted OxyContin to doctors such as general
7  practitioners, who had often had little training in the treatment of serious pain or in
8  recognizing signs of drug abuse in patients. Purdue did not fulfill its responsibility to
9  give adequate information on OxyContin regarding the risks of the drug, which must
10  be done with a powerful narcotic such as OxyContin.

11    40. Ryan relied upon said representations of Defendants, and each of them,
12  in the selection, purchase and use of OxyContin.

13    41. Said representations by Defendants, and each of them, were false and
14  untrue, in that OxyContin was not safe for its intended use, nor was it of
15  merchantable quality as represented by Defendants, and each of them, in that it had
16  very dangerous properties and defects that caused severe addiction, injury and
17  damage to the users of said product, including Ryan, thereby threatening the health
18  and life of Ryan.

19    42. As a direct and proximate result of the acts, omissions, and false
20  representations described herein, Ryan developed a dependence upon OxyContin.
21  As a result of his addiction, he has suffered tremendous physical, mental, and
22  emotional damage. All of his addiction and ensuing physical, mental, and emotional
23  damage was the direct and sole result of the misbranding and fraudulent and
24  deceptive misrepresentations and failure to warn of the Defendants. The Defendants
25  knew, or should have known, that the ingesting of OxyContin leads to drug
26  dependency, tolerance, addiction, and withdrawal symptoms.

27    43. In the treatment of the aforesaid injuries, Ryan has incurred, and is
28  presently incurring, and will incur liability for the services of physicians and other

1   medical treatment, the true and exact amount thereof being unknown to Ryan at this
2   time, and Ryan prays leave to amend this complaint accordingly when the true and
3   exact cost thereof is ascertained by Ryan.

4       44.     As a direct and proximate result of the said negligence and carelessness
5   of Defendants, and each of them, Ryan has incurred, and will incur, loss of income,
6   wages, profits and commissions, a diminishment of earning potential, and other
7   pecuniary losses, the full nature and extent of which are not yet known to Ryan, and
8   leave is requested to amend this complaint to conform to proof at the time of trial.

9       45.     Defendants' acts and omissions were malicious. The fraudulent
10  misrepresentations, misbranding, and failure to warn on the part of Defendants was
11  done with gross negligence, which evidenced a willful, wanton, and reckless
12  disregard for the safety of others, justifying an award of punitive damages in
13  addition to compensatory damages in this matter.

14      46.     As a proximate result of said false representations by Defendants, and
15  each of them, Plaintiff sustained the injuries and damages hereinabove set forth.

16      47.     WHEREFORE, Plaintiff prays judgment against Defendants, and each of
17  them, as hereinafter set forth.

18

19                  **COUNT TWO: FRAUDULENT CONCEALMENT**

20                      **Ryan L. Ryan Against All Defendants**

21      48.     Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by
22  reference each and every allegation contained in paragraphs 1-47 of the within
23  complaint.

24      49.     At this aforementioned time when Defendants, and each of them,
25  manufactured, designed, assembled, compounded, tested or failed to test, inspected
26  or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed,
27  serviced, merchandised, recommended, advertised, promoted, marketed and sold
28  OxyContin, as hereinabove set forth, the Defendants, and each of them, expressly and

11
COMPLAINT

1  impliedly represented to members of the general public, including Plaintiff, that
2  OxyContin was of merchantable quality and safe for the use for which it was
3  intended.

4      50.    Said fraudulent representations by Defendants, and each of them, were
5  false and untrue, in that OxyContin was not safe for its intended use, nor was it of
6  merchantable quality as represented by Defendants, and each of them. Defendants
7  had concealed very dangerous properties, defects, hazards, and risks that caused
8  addiction, injury, and damage to the users of OxyContin, including Ryan, thereby
9  threatening his health and life.

10     51.    Beginning in on or about 2001, according to proof, Ryan was prescribed
11  OxyContin, a powerful prescription drug developed, marketed, and manufactured
12  by Defendants.

13     52.    When Ryan was prescribed OxyContin, he had no knowledge that it
14  was highly addictive.

15     53.    After being prescribed OxyContin, Ryan developed tolerance to the
16  drug and severe opiate dependency, so that withdrawal symptoms would result if he
17  abruptly discontinued the use of OxyContin, and the true cause of his underlying
18  physiological pain was obscured and could not be properly diagnosed. Ryan' dosage
19  of OxyContin escalated to four 80 mg. tablets daily, despite his attempts to
20  discontinue the drug.

21     54.    Ryan' ensuing addiction to OxyContin made him increasingly
22  dysfunctional and unreliable, resulting in his spending the better part of on or about
23  five years, according to proof, all but immobilized in bed. Ryan' addiction to
24  OxyContin caused suffering in his life and in the life of his family, caused
25  estrangement between Ryan and his spouse and children, and caused estrangement
26  between Ryan and members of his church.

27     55.    Ryan entered Saint Helena Hospital for treatment of chemical
28  dependency on April 13, 2007. At St. Helena Hospital, Ryan learned and appreciated

1   for the first time that he was addicted to OxyContin, the extent of his addiction, the

2   highly addictive properties of OxyContin, and the unsuitability of OxyContin for

3   moderate pain relief. Only his strong motivation, based upon the values of his family,

4   his religious beliefs, and his fear of estrangement from his church and family,

5   allowed him to become free of his addiction to OxyContin.

6      56.    On or about May 10, 2007, Defendant Purdue Frederick, a holding

7   company affiliated with Purdue Pharma, pleaded guilty in United States of America

8   v. the Purdue Frederick Company, Inc., et al., United States District Court for the

9   Western District of Virginia Abingdon Division case No. 1:07CR00029, to a felony

10  criminal charge that it had misbranded OxyContin with the intent to defraud or

11  mislead, a felony under the federal Food, Drug, and Cosmetic Act, 21 U.S.C.A.

12  331(a), 333(a)(2) (West 1999). Purdue was charged with fraudulently claiming to

13  doctors and patients for on or about six years that OxyContin would cause less abuse

14  and addiction than competing short-acting narcotics such as Percocet and Vicodin,

15  although the Food and Drug Administration ("FDA") had allowed Purdue to claim

16  only that it "believed" that OxyContin, because it was time-released and long-acting,

17  might be less prone to abuse. To settle that charge, Defendant Purdue Frederick

18  agreed to pay $600 million in fines and other payments. Judge James P. Jones of the

19  United States District Court put Purdue Frederick on five years' probation.

20     57.    Also on or about May 10, 2007, in the same case, three executives of

21  Purdue, its former president and CEO, former chief scientific officer, and executive

22  vice president and chief legal officer, pleaded guilty as individuals to the

23  misdemeanor charge of misbranding, solely as responsible corporate officers,

24  pursuant to U.S.C.A. 333(a)(1). The three executives agreed to pay a total of $34.5

25  million in fines, and were   sentenced to three years' probation and 400 hours each of

26  community service in drug treatment programs by Judge James P. Jones of the

27  United States District Court.

28

13
COMPLAINT

1       58.    Oxycontin contains time-released doses of the narcotic oxycodone, and
2   Purdue claimed that it provided relief of moderate to serious pain for up to 12 hours.
3   Oxycodone is an opioid—that is, a synthetic opiate similar to other opium derivatives
4   such as morphine—and is classified as a Schedule II controlled substance by the Drug
5   Enforcement Agency. Unlike other medications like Percocet that contain oxycodone
6   along with other ingredients, OxyContin's sole ingredient is pure oxycodone, with a
7   large amount in each tablet because of the time-release design.

8       59.    When Purdue applied for various U.S. Patents for controlled release
9   oxycodone medications for the treatment of moderate to severe pain, it claimed that
10  because OxyContin has a controlled release mechanism, it could administer
11  significantly more effective doses of pain medication over time, and the patient only
12  has to use it twice a day. Purude also claimed that, using a four-fold range of dosages
13  (e.g., between 10 mg. and 40 mg.), OxyContin achieves the same clinical results as
14  prior art opioid formulations using an eight-fold range of dosages (e.g., between 10
15  mg. and 80 mg.). Purdue claimed that the "clinical significance" of the four-fold
16  dosage range of the controlled release OxyContin product, as compared to other
17  opioid analgesics, such as morphine, requiring twice the dosage range, was a more
18  efficient titration process, which is the process of adjusting a patient's dosage to
19  provide acceptable pain relief without unacceptable side effects.

20      60.    Purdue characterized the four-fold dosage range of the claimed
21  oxycodone controlled release formulation as a surprising discovery. Purdue
22  repeatedly relied on that discovery to distinguish its invention from other prior art
23  opioids, while using language that suggested the existence of clinical results
24  supporting the reduced dosage range. Purdue made statements implying that an
25  empirical basis existed for its discovery and then concealed and failed to disclose that
26  the discovery was based only on insight. Although Purdue admittedly was in fact
27  unable to prove with experimental results that OxyContin was the most efficiently
28  titratable analgesic, OxyContin was approved by the FDA on December 12, 1995. The

1    FDA allowed the company to claim only that it "believed" that the drug, because it

2    was long-acting, might be less prone to abuse than other opioids.

3        61.    Like morphine, OxyContin is highly addictive, and can produce

4    withdrawal symptoms in patients who use it for only five to seven days. It is

5    Plaintiffs' information and belief, and they therefore allege, that internal Purdue

6    documents indicate that Purdue recognized even before the drug was marketed that

7    it would face stiff resistance from doctors who were concerned about the potential of

8    a high-powered narcotic like OxyContin to cause addiction. As a result, certain

9    Purdue officials developed a fraudulent marketing campaign designed to promote

10   OxyContin as a time-released drug that would cause less abuse and addiction than

11   competing short-acting narcotics such as Percocet and Vicodin.

12       62.    Shortly after its introduction, OxyContin became Purdue's best selling

13   and most profitable product. From January 1996 through June 30, 2001, Purdue

14   received approximately $ 2.8 billion in revenue from the sale of OxyContin.

15       63.    A so-promotion agreement between Purdue and Abbott Laboratories

16   and Abbott Laboratories, Inc. ("Abbott") provided for the sharing of promotion

17   obligations and the payment by Purdue to Abbott of a commission on net sales.

18       64.    It is Ryan' information and belief, and he therefore alleges, that

19   notwithstanding the knowledge possessed by Defendants, they willfully,

20   intentionally and fraudulently concealed and downplayed the hazards and risks

21   associated with prescribing OxyContin to medical providers and to the general

22   public, including the risks of dependence, tolerance, overdose, and severe

23   withdrawal symptoms. Therefore, Ryan' physician did not have adequate

24   information when he wrote the initial prescription.

25       65.    It is Ryan's information and belief, and he therefore alleges, that he and

26   his physician were misled by Defendants' fraudulent concealment of the hazards and

27   risks associated with taking OxyContin, that the signs of abuse and addiction were

28

15
COMPLAINT

1   concealed, and that the need for a tapered withdrawal from the drug was not

2   emphasized by Purdue.

3       66.     It is Ryan's information and belief, and he therefore alleges, that Purdue

4   initially contended that OxyContin, because of its time-release formulation, posed a

5   lower threat of abuse and addiction to patients than do traditional, shorter-acting

6   painkillers such as Percocet or Vicodin.

7       67.     Purdue    misbranded    OxyContin,    fraudulently    and    deceptively

8   represented OxyContin, and dishonestly marketed the pain pill by concealing from

9   doctors, pharmacists and patients information about the drug's addictive qualities.

10  Purdue marketed OxyContin to medical providers and to the general public in the

11  most aggressive marketing campaign ever undertaken by a pharmaceutical company

12  for a narcotic painkiller. Purdue heavily promoted OxyContin to doctors such as

13  general practitioners, who had often had little training in the treatment of serious

14  pain or in recognizing signs of drug abuse in patients. Purdue did not fulfill its

15  responsibility to give adequate information on OxyContin regarding the risks of the

16  drug, which must be done with a powerful narcotic such as OxyContin, and, in fact,

17  concealed the hazards and risks of the drug.

18      68.     Ryan relied upon said fraudulent representation of Defendants, and

19  each of them, in the selection, purchase and use of OxyContin.

20      69.     Said representations by Defendants, and each of them, were false and

21  untrue and concealed facts, in that OxyContin was not safe for its intended use, nor

22  was it of merchantable quality as represented by Defendants, and each of them, in

23  that it had very dangerous properties and defects that caused severe addiction, injury

24  and damage to the users of said product, including Ryan, thereby threatening his

25  health and life.

26      70.     Ryan was ignorant of the risks involved and would not have taken

27  OxyContin for pain management if he had known the true facts.

28

1    71.    In undertaking the conduct described above, Defendants, and each of
2    them, acted in willful and conscious disregard of the rights and safety of Ryan.

3    72.    As a result of such conduct, Defendants, and each of them, were guilty
4    of malice and oppression as defined in California Civil Code § 3294.

5    73.    As a direct and proximate result of the acts, omissions, and false
6    representations described herein, Ryan developed a dependence upon OxyContin.
7    As a result of his addiction, he has suffered tremendous physical, mental, and
8    emotional damage. All of his addiction and ensuing physical, mental, and emotional
9    damage was the direct and sole result of the misbranding and fraudulent and
10   deceptive concealment of Defendants. Defendants knew, or should have known, that
11   the ingesting of OxyContin leads to drug dependency, tolerance, addiction, and
12   withdrawal symptoms.

13   74.    As a further direct and legal result of the fraudulent concealment of
14   Defendants, and each of them described herein, and of the addiction of Ryan, he
15   sustained pecuniary loss and the loss of the love, companionship, comfort, affection,
16   support, society, solace and moral support of his spouse.

17   75.    In the treatment of the aforesaid injuries, Ryan has incurred, and is
18   presently incurring, and will incur liability for the services of physicians and other
19   medical treatment, the true and exact amount thereof being unknown to Ryan at this
20   time, and Ryan prays leave to amend this complaint accordingly when the true and
21   exact cost thereof is ascertained by Ryan.

22   76.    As a direct and proximate result of the said negligence and carelessness
23   of Defendants, and each of them, Ryan has incurred, and will incur, loss of income,
24   wages, profits and commissions, a diminishment of earning potential, and other
25   pecuniary losses, the full nature and extent of which are not yet known to Ryan, and
26   leave is requested to amend this complaint to conform to proof at the time of trial.

27   77.    Defendants' acts and omissions were malicious. The fraudulent
28   concealment on the part of Defendants was done with gross negligence, which

1  evidenced a willful, wanton, and reckless disregard for the safety of others, justifying
2  an award of punitive damages in addition to compensatory damages in this matter.

3  78.    As a proximate result of said false representations by Defendants, and
4  each of them, Ryan sustained the injuries and damages hereinabove set forth.

5  79.    WHEREFORE, Plaintiff prays judgment against Defendants, and each of
6  them, as hereinafter set forth.

8  ## COUNT THREE: PRODUCTS LIABILITY—NEGLIGENCE
9  ## Ryan L. Ryan Against All Defendants

10  80.    Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by
11  reference each and every allegation contained in paragraphs 1-79 of this Complaint.

12  81.    At all times herein mentioned, Defendants, and each of them, were
13  engaged in the pharmaceutical business throughout the United States, including the
14  manufacturing, designing, assembling, compounding, testing, inspecting, packaging,
15  labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,
16  recommending, advertising, promoting, marketing and selling of a prescription opiod
17  pain medication, OxyContin, for sale to and use by members of the general public.

18  82.    At all times herein mentioned, Defendants, and each of them, knew, or
19  in the exercise of ordinary and reasonable care should have known, that the said
20  OxyContin was a product of such a nature that if it was not properly manufactured,
21  designed, assembled, compounded, tested, inspected, packaged, labeled, fabricated,
22  constructed, analyzed, distributed, serviced, merchandised, recommended,
23  advertised, promoted, marketed and sold, for the use and purpose for which it was
24  intended, it was likely to injure the person or persons by whom it was used.

25  83.    Defendants, and each of them, so negligently and carelessly
26  manufactured, designed, assembled, compounded, tested or failed to test, inspected
27  or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed,
28  serviced, merchandised, recommended, advertised, promoted, marketed and sold the

18
COMPLAINT

1   said OxyContin, and its component parts and constituents, so that it was in a
2   dangerous and defective condition, and unsafe for the use and purpose for which it
3   was intended when used as recommended by the Defendants, and each of them.

4       84.    The defective and dangerous character and condition of the said
5   OxyContin, and that it was unsafe for the use and purpose for which it was intended
6   when used as recommended by the Defendants, and each of them, was known to the
7   Defendants, and each of them, or in the exercise of ordinary and reasonable care
8   should have been known and discovered by Defendants, and each of them.
9   Furthermore, the dangerous and defective character and condition of the said
10  OxyContin was not made known to Ryan by the Defendants, and each of them.

11      85.    After being prescribed OxyContin, and using it for the purpose for
12  which it was intended, and as a proximate result of the said negligence and
13  carelessness of Defendants, and each of them, Ryan developed tolerance to the said
14  OxyContin and severe opiate dependency, so that withdrawal symptoms would
15  result if he discontinued its use abruptly. His dosage of OxyContin escalated to four
16  80 mg. tablets daily, despite his attempts to pursue other treatments and to
17  discontinue the drug.

18      86.    As a direct and proximate result of the acts and omissions described
19  herein, Ryan developed a dependence upon OxyContin. Ryan' ensuing addiction to
20  OxyContin made him increasingly dysfunctional and unreliable, resulting in his
21  spending the better part of on or about five years, according to proof, all but
22  immobilized in bed. Ryan' addiction to OxyContin caused suffering in his life and in
23  the life of his family, caused estrangement between Ryan and his spouse and
24  children, and caused estrangement between Ryan and members of his church. As a
25  result of his addiction, Ryan has suffered severe and excruciating pain and
26  distressing mental anguish as a result of his addiction and injuries, and tremendous
27  physical, mental, and emotional damage, and general shock and traumatic neurosis
28  as a result of the said negligence and carelessness of the Defendants, and each of

19
COMPLAINT

1  them. Ryan has suffered, and for a long period of time to come will continue to
2  suffer, said pain and mental anguish as a result of said addiction and ensuing
3  injuries.

4      87.     As a result of the aforesaid injuries, Ryan has been generally damaged
5  in a sum according to proof.

6      88.     In the treatment of the aforesaid injuries, Ryan has incurred, and is
7  presently incurring, and will incur liability for the services of physicians and other
8  medical treatment, the true and exact amount thereof being unknown to Ryan at this
9  time, and Ryan prays leave to amend this complaint accordingly when the true and
10 exact cost thereof is ascertained by Ryan.

11     89.     As a direct and proximate result of the said negligence and carelessness
12 of Defendants, and each of them, Ryan has incurred, and will incur, loss of income,
13 wages, profits and commissions, a diminishment of earning potential, and other
14 pecuniary losses, the full nature and extent of which are not yet known to Ryan, and
15 leave is requested to amend this complaint to conform to proof at the time of trial.

16              **COUNT FOUR: STRICT PRODUCTS LIABILITY: FAILURE TO WARN**
17                        **Ryan L. Ryan Against All Defendants**

18     90.     Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by
19 reference each and every allegation contained in paragraphs 1-89 of the within
20 complaint, and makes said paragraphs a part of this, the fifth count, as though fully
21 set forth herein.

22     91.     At all times herein mentioned, Defendants, and each of them, were
23 engaged in the pharmaceutical business throughout the United States, including the
24 manufacturing, designing, assembling, compounding, testing, inspecting, packaging,
25 labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,
26 recommending, advertising, promoting, marketing and selling of a prescription opiod
27 pain medication, OxyContin, for sale to and use by members of the general public.

28

92.     Defendants, and each of them, knew that said OxyContin was to be purchased and used without inspection for defects by Plaintiff and the general public.

93.     Defendants, and each of them, had knowledge of OxyContin's risks when they placed OxyContin into the stream of commerce, and had a duty to warn consumers of such risks.

94.     The said OxyContin was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to addiction and serious injury, because of the failure of Defendants, and each of them, to properly warn, guard, and protect the users of the said OxyContin from the defective design of said product.

95.     Ryan was not aware of said defects at any time prior to the injuries cause by the said OxyContin.

96.     As a proximate result of the said defects of the said OxyContin, Ryan suffered addiction and sustained the injuries and damages hereinabove set forth.

97.     Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

98.     WHEREFORE, Ryan prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT FIVE: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ryan L. Ryan Against All Defendants

99.     Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-98 of the within complaint, and makes said paragraphs a part of this, the sixth count, as though fully set forth herein.

1    100.    Prior to on or about 2001, according to proof, and prior to the time that
2    the said drug, OxyContin, was being used by Ryan, Defendants, and each of them,
3    impliedly warranted to members of the general public, including Ryan, that the said
4    OxyContin was of merchantable quality and safe for the use for which it was intended
5    by the Defendants, namely, for the purpose of moderate pain management.

6    101.    Ryan relied on the skill and judgment of Defendants, and each of them,
7    in the selection, purchase and use of the said OxyContin.

8    102.    The said OxyContin was not safe for its intended use of moderate pain
9    management, nor was it of merchantable quality as warranted by Defendants, and
10   each of them, in that it was defectively designed, thereby dangerously exposing the
11   user of said OxyContin and those around it to serious addiction and injury.

12   103.    After Ryan received the injuries complained of herein as a result of said
13   defective condition of the said OxyContin, notice was given by Ryan to Defendants of
14   the breach of said implied warranty.

15   104.    As a proximate result of the breach of said implied warranty, Plaintiff
16   sustained the injuries and damages hereinabove set forth.

17   105.    Defendants' acts and omissions were malicious and done with gross
18   negligence, which evidenced a willful, wanton, and reckless disregard for the safety
19   of others, justifying an award of punitive damages in addition to compensatory
20   damages in this matter.

21   106.    WHEREFORE, Plaintiff prays judgment against Defendants, and each of
22   them, as hereinafter set forth.

23

24            **COUNT SIX: BREACH OF IMPLIED WARRANTY OF FITNESS FOR**
25                        **PARTICULAR PURPOSE**
                     **Ryan L. Ryan Against All Defendants**
26   107.    Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by
27   reference each and every allegation contained in paragraphs 1-106 of the within
28

1  complaint, and makes said paragraphs a part of this, the seventh count, as though
2  fully set forth herein.

3      108.    Prior to on or about 2001, according to proof, and prior to the time that
4  the said drug, OxyContin, was being used by Ryan, Defendants, and each of them,
5  impliedly warranted to members of the general public, including Ryan, that the said
6  OxyContin was of merchantable quality and safe for the use for which it was intended
7  by the Defendants, namely, for the purpose of pain management.

8      109.    Ryan relied on the skill and judgment of Defendants, and each of them,
9  in the selection, purchase and use of the said OxyContin.

10      110.    The said OxyContin was not safe for its intended use nor was it of
11  merchantable quality as warranted by Defendants, and each of them, in that it was
12  defectively designed, thereby dangerously exposing the user of said OxyContin and
13  those around it to serious injury.

14      111.    After Ryan received the injuries complained of herein as a result of said
15  defective condition of the said OxyContin, notice was give by Ryan to Defendants of
16  the breach of said implied warranty.

17      112.    As a proximate result of the breach of said implied warranty, Ryan
18  sustained the injuries and damages hereinabove set forth.

19      113.    Defendants' acts and omissions were malicious and done with gross
20  negligence, which evidenced a willful, wanton, and reckless disregard for the safety
21  of others, justifying an award of punitive damages in addition to compensatory
22  damages in this matter.

23      114.    WHEREFORE, Ryan prays judgment against Defendants, and each of
24  them, as hereinafter set forth.

25

26  **COUNT SEVEN: BREACH OF EXPRESS WARRANTY OF FITNESS FOR**
**PARTICULAR PURPOSE**
27  **Ryan L. Ryan Against All Defendants**

28

23
COMPLAINT

1    115.   Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by

2  reference each and every allegation contained in paragraphs 1-98 of the within

3  complaint.

4    116.   At all times herein mentioned, prior to on or about 2000 to 2002,

5  according to proof, and prior to the time that the said drug, OxyContin, was being

6  used by Ryan, Defendants, and each of them, utilized advertising media, professional

7  publications and detail persons to urge the use and purchase of the said OxyContin,

8  and expressly warranted to members of the general public, including the Plaintiff

9  herein, that the said OxyContin was effective, proper and safe for its intended use.

10   117.   Ryan relied upon the said express warranty representations of the

11  Defendants, and each of them, in the purchase and use of said OxyContin.

12   118.   The said OxyContin was not effective, proper and safe for its intended

13  use as expressly warranted by Defendants, and each of them, in that the said

14  OxyContin was defective, thereby causing serious addiction and injury when said

15  OxyContin was being put to its intended use.

16   119.   Within a reasonable time after discovery that the said OxyContin was

17  defective and unsafe for its intended use, Ryan notified Defendants of the breach of

18  said express warranty.

19   120.   As a proximate result of ht breach of the said express warranty, Ryan

20  sustained the injuries and damages hereinabove set forth.

21   121.   Defendants' acts and omissions were malicious and done with gross

22  negligence, which evidenced a willful, wanton, and reckless disregard for the safety

23  of others, justifying an award of punitive damages in addition to compensatory

24  damages in this matter.

25   122.   WHEREFORE, Plaintiff prays judgment against Defendants, and each of

26  them, as hereinafter set forth.

27

28

24
COMPLAINT

1

2

## COUNT EIGHT: STRICT LIABILITY IN TORT
## Ryan L. Ryan Against All Defendants

3

4

5

123.    Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-122 of the within complaint.

6

7

8

9

10

124.    Defendants, and each of them, manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold a certain OxyContin, which was intended by the Defendants, and each of them, to be used for the purpose of pain management.

11

12

125.    Defendants, and each of them, knew that said OxyContin was to be purchased and used without inspection for defects by Plaintiff and the general public.

13

14

15

16

17

126.    The said Oxycontin was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to serious injury because of the failure of Defendants, and each of them, to properly guard and protect the users of the said OxyContin from the defective design of said product.

18

19

127.    Ryan was not aware of said defects at any time prior to the injuries caused by the said OxyContin.

20

21

128.    As a proximate result of the said defects of the said OxyContin, Ryan sustained the injuries and damages hereinabove set forth.

22

23

24

25

129.    Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

26

27

130.    WHEREFORE, Ryan prays judgment against Defendants, and each of them, as hereinafter set forth.

28

1    WHEREFORE, Plaintiff prays judgment against the Defendants, and each of
2  them, as follows:

## COUNT ONE: FRAUDULENT REPRESENTATION
### Ryan L. Ryan Against All Defendants

1. For Plaintiff's general damages according to proof;
2. For compensatory damages within the jurisdiction of this Court in an amount according to proof;
3. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;
4. For Plaintiff's loss of income, wages, and earning potential, according to proof;
5. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT TWO: FRAUDULENT CONCEALMENT
### Ryan L. Ryan Against All Defendants

6. For Plaintiff's general damages according to proof;
7. For compensatory damages within the jurisdiction of this Court in an amount according to proof;
8. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;
9. For Plaintiff's loss of income, wages, and earning potential, according to proof;
10. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

COMPLAINT

## COUNT THREE: PRODUCTS LIABILITY—NEGLIGENCE
### Ryan L. Ryan Against All Defendants

11. For Plaintiff's general damages according to proof;

12. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

13. For Plaintiff's loss of income, wages, and earning potential, according to proof;

14. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT FOUR: STRICT PRODUCTS LIABILITY: FAILURE TO WARN
### Ryan L. Ryan Against All Defendants

15. For Plaintiff's general damages according to proof;

16. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

17. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

18. For Plaintiff's loss of income, wages, and earning potential, according to proof;

19. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT FIVE: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ryan L. Ryan Against All Defendants

20. For Plaintiff's general damages according to proof;

21. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

22. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

23. For Plaintiff's loss of income, wages, and earning potential, according to proof;

24. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT SIX: BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Ryan Against All Defendants

25. For Plaintiff's general damages according to proof;

26. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

27. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

28. For Plaintiff's loss of income, wages, and earning potential, according to proof;

29. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT SEVEN: BREACH OF EXPRESS WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Ryan Against All Defendants

30. For Plaintiff's general damages according to proof;

31. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

32. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

1     33. For Plaintiff's loss of income, wages, and earning potential, according

2         to proof;

3     34. For Plaintiff's medical and related damages according to proof,

4         including the cost of rehabilitation from his addiction to OxyContin;

5

6     **COUNT EIGHT: STRICT LIABILITY IN TORT**

7     **Ryan L. Ryan Against All Defendants**
      35. For Plaintiff's general damages according to proof;

8     36. For compensatory damages within the jurisdiction of this Court in an

9         amount according to proof;

10    37. For exemplary and punitive damages as the jury may deem just and

11        proper, in an amount sufficient to punish Defendants and set an

12        example for others;

13    38. For Plaintiff's loss of income, wages, and earning potential, according

14        to proof;

15    39. For Plaintiff's medical and related damages according to proof,

16        including the cost of rehabilitation from his addiction to OxyContin;

17

18    **ALL CAUSES OF ACTION**

19    43. For costs of suit herein incurred; and,

20    44. For such other and further relief as the court may deem proper.

21

22                    Respectfully submitted,

23                    LAW OFFICES OF RICHARD SAX

24                    Dated: July 25, 2007

25                    By: _____

26                        Richard Sax

27                        Attorney for Plaintiff RYAN L. HOBBS

28


29
COMPLAINT

1

## DEMAND FOR JURY TRIAL

2 | Plaintiff RYAN L. HOBBS hereby demands a jury trial.

3 | Dated:

4 | By:

5 | Richard Sax

Attorney for Plaintiff RYAN L. HOBBS

6

7

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

8

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other

9

than the named parties, there is no such interest to report.

10

Dated:

11 | By:

12 | Richard Sax

13 | Attorney for Plaintiff RYAN L. HOBBS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30
COMPLAINT