1   Richard Sax SBN 80632   *Richard@rsaxlaw.com*
    **LAW OFFICES OF RICHARD SAX**
2   448 Sebastopol Avenue
    Santa Rosa, CA. 95401
3   Telephone: (707) 525-1824
    Facsimile: (707) 525-8119
4

5   Attorney for Plaintiffs RYAN L. HOBBS and MICHELLE HOBBS

6

7
                    **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**

9

10  RYAN  L.  HOBBS  and  MICHELLE          NO: C 07 3854 BZ
    HOBBS,
11
                                            **FIRST AMENDED COMPLAINT**
12              Plaintiffs,                  **FOR DAMAGES FOR**
                                            **FRAUDULENT REPRESENTATION;**
13  v.                                      **FRAUDULENT CONCEALMENT;**
                                            **PRODUCTS LIABILITY—**
14                                          **NEGLIGENCE; STRICT PRODUCTS**
    PURUDE PHARMA COMPANY;                  **LIABILITY: FAILURE TO WARN;**
15  PURDUE PHARMA L.P.; PURDUE              **BREACH OF IMPLIED WARRANTY**
    PHARMA, INC.; THE PURDUE                **OF MERCHANTABILITY; BREACH**
16  FREDERICK COMPANY; PURDUE               **OF IMPLIED WARRANTY OF**
    PHARMACEUTICALS L.P.;                   **FITNESS FOR PARTICULAR**
17  PHARMACEUTICAL RESEARCH                 **PURPOSE; BREACH OF EXPRESS**
    ASSOCIATES, INC.; PURDUE                **WARRANTY OF FITNESS FOR**
18  PHARMA LTD.; P.F. LABORATORIES,         **PARTICULAR PURPOSE; STRICT**
    INC.; and ABBOTT LABORATORIES           **LIABILITY IN TORT; LOSS OF**
19  INC.,                                   **CONSORTIUM**
20
                Defendants.                 **DEMAND FOR JURY TRIAL**
21

22

23

24

25

26

27

28

                                  1
                    FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      This is an action for damages against Defendants PURUDE PHARMA COMPANY; PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY; PURDUE PHARMACEUTICALS L.P.; PHARMACEUTICAL RESEARCH ASSOCIATES, INC.; PURDUE PHARMA LTD.; P.F. LABORATORIES, INC.; and ABBOTT LABORATORIES INC., for Fraudulent Representation; Fraudulent Concealment; Products Liability—Negligence; Strict Products Liability—Design Defect; Strict Products Liability: Failure to Warn; Breach of Implied Warranty of Merchantability; Breach of Implied Warranty of Fitness for Particular Purpose; Breach of Express Warranty of Fitness for Particular Purpose; Breach of Express Warranty of Fitness for Particular Purpose; Strict Liability in Tort; and Loss of Consortium.

**JURISDICTION**

2.      This court has jurisdiction of this matter in accordance with 28 USC 1332(a)(1) in that this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**INTRADISTRICT ASSIGNMENT**

3.      A substantial part of the events or omissions which give use to the claims herein occurred within the State of California, County of Mendocino.

**PARTIES**

4.      At all times relevant herein, Plaintiffs RYAN L. HOBBS and MICHELLE HOBBS ("Plaintiffs") were and now are adult citizens of the United States, residing in the City of Ukiah, County of Mendocino, State of California.

5.      Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMA COMPANY was and is a General Partnership domiciled in Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road,

FIRST AMENDED COMPLAINT

Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

6.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMA L.P. was and is a Limited Partnership (LP) domiciled in Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

7.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMA INC. was and is a corporation, duly organized and existing under the laws of the State of New York, that may be served with process by serving their registered agent, Prentice Hall Corporation System, 50 Weston Street, Hartford, Connecticut 06120-1537, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

8.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant THE PURDUE FREDERICK COMPANY was and is a corporation, duly organized and existing under the laws of the State of New York, headquartered in Connecticut, that may be served with process by serving their registered agent, Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120-1537, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

9.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMACEUTICALS L.P. was and is a Limited Partnership (LP) domiciled in Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

FIRST AMENDED COMPLAINT

10.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PHARMACEUTICAL RESEARCH ASSOCIATES, INC. was and is a corporation, duly organized and existing under the laws of the State of Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

11.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant PURDUE PHARMA LTD. was and is a corporation, duly organized and existing under the laws of the State of Delaware, that may be served with process by serving their registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

12.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant P.F. LABORATORIES INC., was and is a corporation, duly organized and existing under the laws of the State of New Jersey.

13.    Plaintiffs are informed and believe and based thereon allege that at all times relevant herein, Defendant ABBOTT LABORATORIES INC., was and is a corporation, duly organized and existing under the laws of the State of Delaware, that may be served with process by serving their registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, in accordance with Rule 5b of the Federal Rules of Civil Procedure.

14.    At all times herein mentioned, all of the Defendants were the agents, servants and employees of all the other Defendants, and at all of said times were acting in the course and scope of their said agency, service and employment.

15.    At all times herein mentioned, Defendants, and each of them, were engaged in the pharmaceutical business throughout the United States, including the manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,

recommending, advertising, promoting, marketing and selling of a prescription opiod pain medication, OxyContin, for sale to and use by members of the general public.

## COUNT ONE: FRAUDULENT REPRESENTATION
### Ryan L. Hobbs Against All Defendants

16.     Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-15 of the within First Amended Complaint, as though fully set forth herein.

17.     Ryan is a 32-year-old male who is married to Michelle, with whom he has two children.   Ryan and Michelle reside in a small northern California city of approximately 15,500 residents.

18.     In on or about October of 1999, Ryan was involved in an accident while helping his father install a heavy industrial garage door. In the accident, part of the weight of the garage door fell and pushed down on Ryan while he was up on a ladder.

19.     Ryan, who worked in finish cabinetry and carpentry, was left with pain that varied in intensity in relation to his physical activity. Ryan tried treatment for two days at home, but was unable to control the pain and so saw his primary care physician on the second day after the injury. Ryan was initially started on Vicodin for control of the pain, which was centered in his left lower scapular area.

20.     At the time of the accident, Ryan was starting a promising handyman and maintenance business. He had a yellow page ad for his business, which had acquired a large chain account in Mendocino County. Before starting his own business, Ryan worked for R & K Construction in finish carpentry, where installed interior doors, baseboard and door casing, and hardware.

21.     After the accident, Ryan worked intermittently until the middle of the year 2000. Ryan was treated for his injury by Dr. Steven Wirth, his family physican, USCF Pain Clinic, orthopedic physicians from the Spine Center in San Francisco, the Hillside Health Clinic, the Ukiah Valley Medical Center, Dr. Kenneth Light at St.

1 | Francis Memorial Hospital, the Mendocino Community Health Clinic, and the
2 | Stanford Pain Clinic, among others, where he underwent physical therapy, botox
3 | injections, trigger point injections, and other treatments.

4 |      22.     Beginning around the time of his first child's birth, Ryan felt a strong
5 | desire to work more in order to better support his family. Dr. Wirth prescribed
6 | OxyContin Tablets ("OxyContin"), a powerful prescription drug developed and
7 | originally marketed by Defendants, including Purdue Pharma L.P., The Purdue
8 | Frederick Company, The P.F. Laboratories, Inc., and The Purdue Pharma Company
9 | (collectively, "Purdue" or "Defendants"). OxyContin is the trade name for
10 | oxycodone hydrochloride controlled-release tablets, an opioid analgesic drug that
11 | releases the narcotic incrementally over 12 hours and contains more oxycodone than
12 | short-acting opioids. OxyContin is a Schedule II controlled substance with an abuse
13 | liability similar to morphine. Dr. Wirth told Ryan that OxyContin was a strong new
14 | pain pill that would help him because it was stronger than Percocet, but it was a
15 | timed-release pill.

16 |      23.     When Ryan was prescribed OxyContin, he had no knowledge that it was
17 | highly addictive. OxyContin seemed to work well. Ryan did not know that OxyContin's
18 | abuse liability is similar to morphine. Like morphine, OxyContin is highly addictive,
19 | and can produce withdrawal symptoms in patients who use it for only five to seven
20 | days.

21 |      24.     After being prescribed OxyContin, Ryan developed tolerance to the
22 | drug and severe opiate dependency, so that withdrawal symptoms, including severe
23 | joint and muscle pain, would result if he abruptly discontinued the use of
24 | OxyContin. Ryan began taking OxyContin in increasing dosages, with very poor
25 | pain control and decreasing function. The true cause of his underlying physiological
26 | pain was obscured and could not be properly diagnosed.

27

28

FIRST AMENDED COMPLAINT

25.     At one time, Ryan's dosage of OxyContin escalated to approximately 220 mg. daily. He became a recluse, dependent upon SSI for income, and spent a majority of his time at home in bed, hopeless and despondent, even during the day. In 2004, Ryan was told by doctors that he was done, and it was SSI for him.

26.     Ryan's ensuing addiction to OxyContin made him increasingly dysfunctional and unreliable, resulting in his spending the better part of on or about five years, according to proof, all but immobilized in bed. Ryan's addiction to OxyContin caused suffering in his life and in the life of his family, caused estrangement between Ryan and his spouse and children, and caused estrangement between Ryan and members of his church.

27.     Before his addiction to OxyContin, Ryan owned a nice home and three cars, including a van. After his addiction to OxyContin, Ryan was forced to sell two vehicles and transfer the title of his home to his father. He then moved into his father's home, where he slept up to eighteen hours a day. Ryan became estranged from his wife, Michelle, who herself became depressed.  He was disfellowshipped by his church. He began smoking in 2001, and could not stop because OxyContin addiction robbed him of his willpower.

28.     Ryan's addiction to OxyContin was so severe that on August 15, 2004 he entered the emergency room at Ukiah Valley Medical Center after suffering a self-inflicted puncture wound, in a cry for help due to his despair and depression. Ryan was placed on an inpatient psychiatric hospitalization. On October 24, 2004, Ryan developed a viral syndrome with vomiting and diarrhea, and became panicky and anxious when he believed that he had vomited up his OxyContin, and was would suffer narcotic withdrawal. Ryan started hyperventilating, causing acidosis. After being admitted to the Ukiah Valley Medical Center Emergency Department, his symptoms resolved with time after treatment with Ativan, Phenergan, and Cogetin, as well as intravenous fluids.

29.     While Ryan was under the influence of OxyContin, the underlying physiological cause of the pain resulting from his 1999 accident, motor nerve damage

1    around the scapula that had initially been diagnosed by Dr. Steven Wirth, was obscured

2    and masked by Ryan's addiction.

3        30.    After Ryan became addicted to OxyContin, his tremors and other

4    symptoms resulting from his addiction led his medical practitioners to believe that his

5    medical problems were caused by neurological damage or by a mental disorder. Ryan

6    was tested for Parkinson's Disease with negative results. He walked like an elderly

7    man.  He would begin to suffer withdrawal every four hours after taking OxyContin,

8    when his joints would begin to ache, sweat would pour down his face, and his face and

9    neck would turn red.

10       31.    On June 29, 2005, Ryan began an attempt to stop OxyContin use. Sadly, he

11   resumed OxyContin on July 14, 2005. He remained hopeful that his treatments at

12   Stanford would be effective against his addiction.

13       32.    Ryan struggled to withdraw from his addiction to OxyContin. He yearned

14   to return to activities that he loved--construction work, playing football, snowboarding,

15   bowling, surfing, scuba diving, and pretending to be a horse for his three-year-old

16   daughter. He wanted only to learn how to deal with his pain without OxyContin.

17       33.    On approximately May 31, 2005, Ryan began treatment at the Stanford

18   Pain Management Center, where he received Botox injections for his pain. When he was

19   first seen at Stanford, he was taking OxyContin approximately 120 mg. a day.

20       34.    On April 13, 2007, Ryan entered Saint Helena Hospital for treatment of

21   chemical dependency. Ryan's father loaned him approximately $10,000 so that Ryan

22   could enter the St. Helena program. At St. Helena Hospital, Ryan learned and

23   appreciated for the first time that he was addicted to OxyContin, the extent of his

24   addiction, the highly addictive properties of OxyContin, and the unsuitability of

25   OxyContin for moderate pain relief.

26       35.    Ryan's detoxification treatment was one of the most difficult experiences

27   of his life. He took up to six or seven baths a night. The scalding hot water provided

28

1  him with some comfort, and diverted his attention away from his opioid receptors'
2  craving for OxyContin.

3      36.    Ryan was inspired and motivated to withdraw from OxyContin by his
4  immediate and extended family, which was, and is, a very important social and
5  financial support for him. Ryan's strong motivation, drawn from his religious beliefs
6  and the values of his family, allowed him to finally become free of his addiction to
7  OxyContin.

8      37.    After Ryan was able to withdraw from OxyContin, Michelle was gratified
9  "to have my husband back." Ryan's church and family provided him with essential
10 support during his treatment and withdrawal from OxyContin addiction at Saint
11 Helena Hospital.

12     38.    On or about May 10, 2007, Defendant Purdue Frederick, a holding
13 company affiliated with Purdue Pharma, pleaded guilty in <u>United States of America</u>
14 <u>v. the Purdue Frederick Company, Inc., et al.,</u> United States District Court for the
15 Western District of Virginia Abingdon Division case No. 1:07CR00029, to a felony
16 criminal charge that it had misbranded OxyContin with the intent to defraud or
17 mislead, a felony under the federal Food, Drug, and Cosmetic Act, 21 U.S.C.A.
18 331(a), 333(a)(2) (West 1999). Purdue was charged with fraudulently claiming to
19 doctors and patients for on or about six years that OxyContin would cause less abuse
20 and addiction than competing short-acting narcotics such as Percocet and Vicodin,
21 although the Food and Drug Administration ("FDA") had allowed Purdue to claim
22 only that it "believed" that OxyContin, because it was time-released and long-acting,
23 might be less prone to abuse. To settle that charge, Defendant Purdue Frederick
24 agreed to pay $600 million in fines and other payments. Judge James P. Jones of the
25 United States District Court put Purdue Frederick on five years' probation.

26     39.    Also on or about May 10, 2007, in the same case, three executives of
27 Purdue, its former president and CEO, former chief scientific officer, and executive
28 vice president and chief legal officer, pleaded guilty as individuals to the

misdemeanor charge of misbranding, solely as responsible corporate officers, pursuant to U.S.C.A. 333(a)(1). The three executives agreed to pay a total of $34.5 million in fines, and were sentenced to three years' probation and 400 hours each of community service in drug treatment programs by Judge James P. Jones of the United States District Court.

40.    On or about May 10, 2007, Ryan's father called him with the news that Purdue Frederick had pleaded guilty to a felony criminal charge that it had misbranded OxyContin with the intent to defraud or mislead, and that three executives of Purdue pleaded guilty as individuals to the misdemeanor charge of misbranding. Ryan then realized how Defendants had hurt him, and the extent to which they had done so.

41.    When Defendants, and each of them, manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold OxyContin, the Defendants, and each of them, expressly and impliedly represented to members of the general public, including Ryan, that OxyContin was of merchantable quality and safe for the use for which it was intended.

42.    Oxycontin contains time-released doses of the narcotic oxycodone. Purdue claimed that it provided relief of moderate to serious pain for up to 12 hours. Oxycodone is an opoid — that is, a synthetic opiate similar to other opium derivatives such as morphine — and is classified as a Schedule II controlled substance by the Drug Enforcement Agency. Unlike other medications like Percocet that contain oxycodone along with other ingredients, OxyContin's sole ingredient is pure oxycodone, with a large amount in each tablet because of the time-release design.

43.    When Purdue applied for various U.S. Patents for controlled release oxycodone medications for the treatment of moderate to severe pain, it claimed that because OxyContin has a controlled release mechanism, it could administer significantly more effective doses of pain medication over time, and the patient only

has to use it twice a day. Purude also claimed that, using a four-fold range of dosages (e.g., between 10 mg. and 40 mg.), OxyContin achieves the same clinical results as prior art opioid formulations using an eight-fold range of dosages (e.g., between 10 mg. and 80 mg.).  Purdue claimed that the "clinical significance" of the four-fold dosage range of the controlled release OxyContin product, as compared to other opioid analgesics, such as morphine, requiring twice the dosage range, was a more efficient titration process, which is the process of adjusting a patient's dosage to provide acceptable pain relief without unacceptable side effects.

44.    Purdue characterized the four-fold dosage range of the claimed oxycodone controlled release formulation as a surprising discovery. Purdue repeatedly relied on that discovery to distinguish its invention from other prior art opioids, while using language that suggested the existence of clinical results supporting the reduced dosage range. Purdue made statements implying that an empirical basis existed for its discovery and then failed to disclose that the discovery was based only on insight.

45.    Although Purdue admittedly was in fact unable to prove with experimental results that OxyContin was the most efficiently titratable analgesic, OxyContin was approved by the FDA on December 12, 1995. The FDA allowed the company to claim only that it "believed" that the drug, because it was long-acting, might be less prone to abuse than other opioids.

46.    Like morphine, OxyContin is highly addictive, and can produce withdrawal symptoms in patients who use it for only five to seven days. It is Plaintiffs' information and belief, and they therefore allege, that internal Purdue documents indicate that Purdue recognized even before the drug was marketed that it would face stiff resistance from doctors who were concerned about the potential of a high-powered narcotic like OxyContin to cause addiction. As a result, certain Purdue officials developed a fraudulent marketing campaign designed to promote

OxyContin as a time-released drug that would cause less abuse and addiction than competing short-acting narcotics such as Percocet and Vicodin.

47.     Shortly after its introduction, OxyContin became Purdue's best selling and most profitable product. From January 1996 through June 30, 2001, Purdue received approximately $ 2.8 billion in revenue from the sale of OxyContin.

48.     A so-promotion agreement between Purdue and Abbott Laboratories and Abbott Laboratories, Inc. ("Abbott") provided for the sharing of promotion obligations and the payment by Purdue to Abbott of a commission on net sales.

49.     It is Ryan's information and belief, and he therefore alleges, that Purdue has a history of downplaying the risks associated with prescribing OxyContin to medical providers and to the general public, including the risks of dependence, tolerance, overdose, and severe withdrawal symptoms. Therefore, Ryan's physician did not have adequate information when he wrote the initial prescription.

50.     It is Ryan's information and belief, and he therefore alleges, that he and his physician were misled with respect to all the risks associated with taking OxyContin, that the signs of abuse and addiction were never emphasized, and that the need for a tapered withdrawal from the drug was not emphasized by Purdue.

51.     It is Ryan's information and belief, and he therefore alleges, that Purdue initially contended that OxyContin, because of its time-release formulation, posed a lower threat of abuse and addiction to patients than do traditional, shorter-acting painkillers such as Percocet or Vicodin.

52.     Purdue misbranded OxyContin, fraudulently and deceptively represented OxyContin, and dishonestly marketed the pain pill by failing to tell doctors, pharmacists and patients about the drug's addictive qualities. Purdue marketed OxyContin to medical providers and to the general public in the most aggressive marketing campaign ever undertaken by a pharmaceutical company for a narcotic painkiller. Purdue heavily promoted OxyContin to doctors such as general practitioners, who had often had little training in the treatment of serious pain or in

1  recognizing signs of drug abuse in patients. Purdue did not fulfill its responsibility to
2  give adequate information on OxyContin regarding the risks of the drug, which must
3  be done with a powerful narcotic such as OxyContin.

4       53.    Ryan relied upon said representations of Defendants, and each of them,
5  in the selection, purchase and use of OxyContin.

6       54.    Said representations by Defendants, and each of them, were false and
7  untrue, in that OxyContin was not safe for its intended use, nor was it of
8  merchantable quality as represented by Defendants, and each of them, in that it had
9  very dangerous properties and defects that caused severe addiction, injury and
10 damage to the users of said product, including Ryan, thereby threatening the health
11 and life of Ryan.

12      55.    As a direct and proximate result of the acts, omissions, and false
13 representations described herein, Ryan developed a dependence upon OxyContin.
14 As a result of his addiction, he has suffered tremendous physical, mental, and
15 emotional damage. All of his addiction and ensuing physical, mental, and emotional
16 damage was the direct and sole result of the misbranding and fraudulent and
17 deceptive misrepresentations and failure to warn of the Defendants. The Defendants
18 knew, or should have known, that the ingesting of OxyContin leads to drug
19 dependency, tolerance, addiction, and withdrawal symptoms.

20      56.    In the treatment of the aforesaid injuries, Ryan has incurred, and is
21 presently incurring, and will incur liability for the services of physicians and other
22 medical treatment, the true and exact amount thereof being unknown to Ryan at this
23 time, and Ryan prays leave to amend this complaint accordingly when the true and
24 exact cost thereof is ascertained by Ryan.

25      57.    As a direct and proximate result of the said negligence and carelessness
26 of Defendants, and each of them, Ryan has incurred, and will incur, loss of income,
27 wages, profits and commissions, a diminishment of earning potential, and other
28

pecuniary losses, the full nature and extent of which are not yet known to Ryan, and leave is requested to amend this complaint to conform to proof at the time of trial.

58.     Defendants' acts and omissions were malicious. The fraudulent misrepresentations, misbranding, and failure to warn on the part of Defendants was done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

59.     As a proximate result of said false representations by Defendants, and each of them, Plaintiff sustained the injuries and damages hereinabove set forth.

60.     WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT TWO: FRAUDULENT CONCEALMENT
### Ryan L. Hobbs Against All Defendants

61.     Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-60 of the within First Amended Complaint.

62.     At this aforementioned time when Defendants, and each of them, manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold OxyContin, as hereinabove set forth, the Defendants, and each of them, expressly and impliedly represented to members of the general public, including Plaintiff, that OxyContin was of merchantable quality and safe for the use for which it was intended.

63.     Said fraudulent representations by Defendants, and each of them, were false and untrue, in that OxyContin was not safe for its intended use, nor was it of merchantable quality as represented by Defendants, and each of them. Defendants

had concealed very dangerous properties, defects, hazards, and risks that caused addiction, injury, and damage to the users of OxyContin, including Ryan, thereby threatening his health and life.

64.    Beginning in on or about 2001, according to proof, Ryan was prescribed OxyContin, a powerful prescription drug developed, marketed, and manufactured by Defendants.

65.    When Ryan was prescribed OxyContin, he had no knowledge that it was highly addictive.

66.    After being prescribed OxyContin, Ryan developed tolerance to the drug and severe opiate dependency, so that withdrawal symptoms would result if he abruptly discontinued the use of OxyContin, and the true cause of his underlying physiological pain was obscured and could not be properly diagnosed. Ryan' dosage of OxyContin escalated to 220 mg. daily, despite his attempts to discontinue the drug.

67.    At one time, Ryan's dosage of OxyContin escalated to approximately 220 mg. daily. He became a recluse, dependent upon SSI for income, and spent a majority of his time at home in bed, hopeless and despondent, even during the day. In 2004, Ryan was told by doctors that he was done, and it was SSI for him.

68.    Ryan's ensuing addiction to OxyContin made him increasingly dysfunctional and unreliable, resulting in his spending the better part of on or about five years, according to proof, all but immobilized in bed. Ryan's addiction to OxyContin caused suffering in his life and in the life of his family, caused estrangement between Ryan and his spouse and children, and caused estrangement between Ryan and members of his church.

69.    Before his addiction to OxyContin, Ryan owned a nice home and three cars, including a van. After his addiction to OxyContin, Ryan was forced to sell two vehicles and transfer the title of his home to his father. He then moved into his father's home, where he slept up to eighteen hours a day. Ryan became estranged from his wife,

Michelle, who herself became depressed. He was disfellowshipped by his church. He began smoking in on or about 2001, and could not stop because OxyContin addiction robbed him of his willpower.

70.    Ryan entered Saint Helena Hospital for treatment of chemical dependency on April 13, 2007. At St. Helena Hospital, Ryan learned and appreciated for the first time that he was addicted to OxyContin, the extent of his addiction, the highly addictive properties of OxyContin, and the unsuitability of OxyContin for moderate pain relief. Only his strong motivation, based upon the values of his family, his religious beliefs, and his fear of estrangement from his church and family, allowed him to finally become free of his addiction to OxyContin.

71.    On or about May 10, 2007, Defendant Purdue Frederick, a holding company affiliated with Purdue Pharma, pleaded guilty in <u>United States of America v. the Purdue Frederick Company, Inc., et al.,</u> United States District Court for the Western District of Virginia Abingdon Division case No. 1:07CR00029, to a felony criminal charge that it had misbranded OxyContin with the intent to defraud or mislead, a felony under the federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. 331(a), 333(a)(2) (West 1999). Purdue was charged with fraudulently claiming to doctors and patients for on or about six years that OxyContin would cause less abuse and addiction than competing short-acting narcotics such as Percocet and Vicodin, although the Food and Drug Administration ("FDA") had allowed Purdue to claim only that it "believed" that OxyContin, because it was time-released and long-acting, might be less prone to abuse. To settle that charge, Defendant Purdue Frederick agreed to pay $600 million in fines and other payments. Judge James P. Jones of the United States District Court put Purdue Frederick on five years' probation.

72.    Also on or about May 10, 2007, in the same case, three executives of Purdue, its former president and CEO, former chief scientific officer, and executive vice president and chief legal officer, pleaded guilty as individuals to the misdemeanor charge of misbranding, solely as responsible corporate officers,

pursuant to U.S.C.A.  333(a)(1). The three executives agreed to pay a total of $34.5 million in fines, and were  sentenced to three years' probation and 400 hours each of community service in drug treatment programs by Judge James P. Jones of the United States District Court.

73.    On or about May 10, 2007, Ryan's father called him with the news that Purdue Frederick had pleaded guilty to a felony criminal charge that it had misbranded OxyContin with the intent to defraud or mislead, and that three executives of Purdue pleaded guilty as individuals to the misdemeanor charge of misbranding. Ryan then realized how Defendants had hurt him, and the extent to which they had done so.

74.    Oxycontin contains time-released doses of the narcotic oxycodone, and Purdue claimed that it provided relief of moderate to serious pain for up to 12 hours. Oxycodone is an opoid — that is, a synthetic opiate similar to other opium derivatives such as morphine — and is classified as a Schedule II controlled substance by the Drug Enforcement Agency. Unlike other medications like Percocet that contain oxycodone along with other ingredients, OxyContin's sole ingredient is pure oxycodone, with a large amount in each tablet because of the time-release design.

75.    When Purdue applied for various U.S. Patents for controlled release oxycodone medications for the treatment of moderate to severe pain, it claimed that because OxyContin has a controlled release mechanism, it could administer significantly more effective doses of pain medication over time, and the patient only has to use it twice a day. Purude also claimed that, using a four-fold range of dosages (e.g., between 10 mg. and 40 mg.), OxyContin achieves the same clinical results as prior art opioid formulations using an eight-fold range of dosages (e.g., between 10 mg. and 80 mg.).  Purdue claimed that the "clinical significance" of the four-fold dosage range of the controlled release OxyContin product, as compared to other opioid analgesics, such as morphine, requiring twice the dosage range, was a more efficient titration process, which is the process of adjusting a patient's dosage to provide acceptable pain relief without unacceptable side effects.

FIRST AMENDED COMPLAINT

1     76.    Purdue characterized the four-fold dosage range of the claimed
2   oxycodone controlled release formulation as a surprising discovery. Purdue
3   repeatedly relied on that discovery to distinguish its invention from other prior art
4   opioids, while using language that suggested the existence of clinical results
5   supporting the reduced dosage range. Purdue made statements implying that an
6   empirical basis existed for its discovery and then concealed and failed to disclose that
7   the discovery was based only on insight. Although Purdue admittedly was in fact
8   unable to prove with experimental results that OxyContin was the most efficiently
9   titratable analgesic, OxyContin was approved by the FDA on December 12, 1995. The
10   FDA allowed the company to claim only that it "believed" that the drug, because it
11   was long-acting, might be less prone to abuse than other opioids.

12     77.    Like morphine, OxyContin is highly addictive, and can produce
13   withdrawal symptoms in patients who use it for only five to seven days. It is
14   Plaintiffs' information and belief, and they therefore allege, that internal Purdue
15   documents indicate that Purdue recognized even before the drug was marketed that
16   it would face stiff resistance from doctors who were concerned about the potential of
17   a high-powered narcotic like OxyContin to cause addiction. As a result, certain
18   Purdue officials developed a fraudulent marketing campaign designed to promote
19   OxyContin as a time-released drug that would cause less abuse and addiction than
20   competing short-acting narcotics such as Percocet and Vicodin.

21     78.    Shortly after its introduction, OxyContin became Purdue's best selling
22   and most profitable product. From January 1996 through June 30, 2001, Purdue
23   received approximately $ 2.8 billion in revenue from the sale of OxyContin.

24     79.    A so-promotion agreement between Purdue and Abbott Laboratories
25   and Abbott Laboratories, Inc. ("Abbott") provided for the sharing of promotion
26   obligations and the payment by Purdue to Abbott of a commission on net sales.

27     80.    It is Ryan' information and belief, and he therefore alleges, that
28   notwithstanding the knowledge possessed by Defendants, they willfully,

intentionally and fraudulently concealed and downplayed the hazards and risks associated with prescribing OxyContin to medical providers and to the general public, including the risks of dependence, tolerance, overdose, and severe withdrawal symptoms. Therefore, Ryan' physician did not have adequate information when he wrote the initial prescription.

81.     It is Ryan's information and belief, and he therefore alleges, that he and his physician were misled by Defendants' fraudulent concealment of the hazards and risks associated with taking OxyContin, that the signs of abuse and addiction were concealed, and that the need for a tapered withdrawal from the drug was not emphasized by Purdue.

82.     It is Ryan's information and belief, and he therefore alleges, that Purdue initially contended that OxyContin, because of its time-release formulation, posed a lower threat of abuse and addiction to patients than do traditional, shorter-acting painkillers such as Percocet or Vicodin.

83.     Purdue misbranded OxyContin, fraudulently and deceptively represented OxyContin, and dishonestly marketed the pain pill by concealing from doctors, pharmacists and patients information about the drug's addictive qualities. Purdue marketed OxyContin to medical providers and to the general public in the most aggressive marketing campaign ever undertaken by a pharmaceutical company for a narcotic painkiller. Purdue heavily promoted OxyContin to doctors such as general practitioners, who had often had little training in the treatment of serious pain or in recognizing signs of drug abuse in patients. Purdue did not fulfill its responsibility to give adequate information on OxyContin regarding the risks of the drug, which must be done with a powerful narcotic such as OxyContin, and, in fact, concealed the hazards and risks of the drug.

84.     Ryan relied upon said fraudulent representation of Defendants, and each of them, in the selection, purchase and use of OxyContin.

85.    Said representations by Defendants, and each of them, were false and untrue and concealed facts, in that OxyContin was not safe for its intended use, nor was it of merchantable quality as represented by Defendants, and each of them, in that it had very dangerous properties and defects that caused severe addiction, injury and damage to the users of said product, including Ryan, thereby threatening his health and life.

86.    Ryan was ignorant of the risks involved and would not have taken OxyContin for pain management if he had known the true facts.

87.    In undertaking the conduct described above, Defendants, and each of them, acted in willful and conscious disregard of the rights and safety of Ryan.

88.    As a result of such conduct, Defendants, and each of them, were guilty of malice and oppression as defined in California Civil Code § 3294.

89.    As a direct and proximate result of the acts, omissions, and false representations described herein, Ryan developed a dependence upon OxyContin. As a result of his addiction, he has suffered tremendous physical, mental, and emotional damage. All of his addiction and ensuing physical, mental, and emotional damage was the direct and sole result of the misbranding and fraudulent and deceptive concealment of Defendants. Defendants knew, or should have known, that the ingesting of OxyContin leads to drug dependency, tolerance, addiction, and withdrawal symptoms.

90.    As a further direct and legal result of the fraudulent concealment of Defendants, and each of them described herein, and of the addiction of Ryan, he sustained pecuniary loss and the loss of the love, companionship, comfort, affection, support, society, solace and moral support of his spouse.

91.    In the treatment of the aforesaid injuries, Ryan has incurred, and is presently incurring, and will incur liability for the services of physicians and other medical treatment, the true and exact amount thereof being unknown to Ryan at this

FIRST AMENDED COMPLAINT

1   time, and Ryan prays leave to amend this complaint accordingly when the true and

2   exact cost thereof is ascertained by Ryan.

3       92.    As a direct and proximate result of the said negligence and carelessness

4   of Defendants, and each of them, Ryan has incurred, and will incur, loss of income,

5   wages, profits and commissions, a diminishment of earning potential, and other

6   pecuniary losses, the full nature and extent of which are not yet known to Ryan, and

7   leave is requested to amend this complaint to conform to proof at the time of trial.

8       93.    Defendants' acts and omissions were malicious.    The fraudulent

9   concealment on the part of Defendants was done with gross negligence, which

10  evidenced a willful, wanton, and reckless disregard for the safety of others, justifying

11  an award of punitive damages in addition to compensatory damages in this matter.

12      94.    As a proximate result of said false representations by Defendants, and

13  each of them, Ryan sustained the injuries and damages hereinabove set forth.

14      95.    WHEREFORE, Plaintiff prays judgment against Defendants, and each of

15  them, as hereinafter set forth.

16

17              **COUNT THREE: PRODUCTS LIABILITY—NEGLIGENCE**

18                  **Ryan L. Hobbs Against All Defendants**

19      96.    Plaintiff Ryan L. Ryan ("Ryan") realleges and incorporates herein by

20  reference each and every allegation contained in paragraphs 1-95 of this First

21  Amended Complaint.

22      97.    At all times herein mentioned, Defendants, and each of them, were

23  engaged in the pharmaceutical business throughout the United States, including the

24  manufacturing, designing, assembling, compounding, testing, inspecting, packaging,

25  labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,

26  recommending, advertising, promoting, marketing and selling of a prescription opiod

27  pain medication, OxyContin, for sale to and use by members of the general public.

28

98.     At all times herein mentioned, Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the said OxyContin was a product of such a nature that if it was not properly manufactured, designed, assembled, compounded, tested, inspected, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold, for the use and purpose for which it was intended, it was likely to injure the person or persons by whom it was used.

99.     Defendants, and each of them, so negligently and carelessly manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold the said OxyContin, and its component parts and constituents, so that it was in a dangerous and defective condition, and unsafe for the use and purpose for which it was intended when used as recommended by the Defendants, and each of them.

100.    The defective and dangerous character and condition of the said OxyContin, and that it was unsafe for the use and purpose for which it was intended when used as recommended by the Defendants, and each of them, was known to the Defendants, and each of them, or in the exercise of ordinary and reasonable care should have been known and discovered by Defendants, and each of them. Furthermore, the dangerous and defective character and condition of the said OxyContin was not made known to Ryan by the Defendants, and each of them.

101.    After being prescribed OxyContin, and using it for the purpose for which it was intended, and as a proximate result of the said negligence and carelessness of Defendants, and each of them, Ryan developed tolerance to the said OxyContin and severe opiate dependency, so that withdrawal symptoms would result if he discontinued its use abruptly. His dosage of OxyContin escalated to four 80 mg. tablets daily, despite his attempts to pursue other treatments and to discontinue the drug.

102.    As a direct and proximate result of the acts and omissions described herein, Ryan developed a dependence upon OxyContin. Ryan' ensuing addiction to OxyContin made him increasingly dysfunctional and unreliable, resulting in his spending the better part of on or about five years, according to proof, all but immobilized in bed. Ryan' addiction to OxyContin caused suffering in his life and in the life of his family, caused estrangement between Ryan and his spouse and children, and caused estrangement between Ryan and members of his church. As a result of his addiction, Ryan has suffered severe and excruciating pain and distressing mental anguish as a result of his addiction and injuries, and tremendous physical, mental, and emotional damage, and general shock and traumatic neurosis as a result of the said negligence and carelessness of the Defendants, and each of them. Ryan has suffered, and for a long period of time to come will continue to suffer, said pain and mental anguish as a result of said addiction and ensuing injuries.

103.    As a result of the aforesaid injuries, Ryan has been generally damaged in a sum according to proof.

104.    In the treatment of the aforesaid injuries, Ryan has incurred, and is presently incurring, and will incur liability for the services of physicians and other medical treatment, the true and exact amount thereof being unknown to Ryan at this time, and Ryan prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained by Ryan.

105.    As a direct and proximate result of the said negligence and carelessness of Defendants, and each of them, Ryan has incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Ryan, and leave is requested to amend this complaint to conform to proof at the time of trial.

//

//

23

FIRST AMENDED COMPLAINT

## COUNT FOUR: STRICT PRODUCTS LIABILITY: FAILURE TO WARN
### Ryan L. Hobbs Against All Defendants

106.    Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-105 of the within First Amended Complaint, and makes said paragraphs a part of this, the fourth count, as though fully set forth herein.

107.    At all times herein mentioned, Defendants, and each of them, were engaged in the pharmaceutical business throughout the United States, including the manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising, recommending, advertising, promoting, marketing and selling of a prescription opiod pain medication, OxyContin, for sale to and use by members of the general public.

108.    Defendants, and each of them, knew that said OxyContin was to be purchased and used without inspection for defects by Plaintiff and the general public.

109.    Defendants, and each of them, had knowledge of OxyContin's risks when they placed OxyContin into the stream of commerce, and had a duty to warn consumers of such risks.

110.    The said OxyContin was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to addiction and serious injury, because of the failure of Defendants, and each of them, to properly warn, guard, and protect the users of the said OxyContin from the defective design of said product.

111.    Ryan was not aware of said defects at any time prior to the injuries cause by the said OxyContin.

112.    As a proximate result of the said defects of the said OxyContin, Ryan suffered addiction and sustained the injuries and damages hereinabove set forth.

FIRST AMENDED COMPLAINT

113.. Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

114. WHEREFORE, Ryan prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT FIVE: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ryan L. Hobbs Against All Defendants

115. Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-114 of the within First Amended Complaint, and makes said paragraphs a part of this, the fifth count, as though fully set forth herein.

116. Prior to on or about 2001, according to proof, and prior to the time that the said drug, OxyContin, was being used by Ryan, Defendants, and each of them, impliedly warranted to members of the general public, including Ryan, that the said OxyContin was of merchantable quality and safe for the use for which it was intended by the Defendants, namely, for the purpose of moderate pain management.

117. Ryan relied on the skill and judgment of Defendants, and each of them, in the selection, purchase and use of the said OxyContin.

118. The said OxyContin was not safe for its intended use of moderate pain management, nor was it of merchantable quality as warranted by Defendants, and each of them, in that it was defectively designed, thereby dangerously exposing the user of said OxyContin and those around it to serious addiction and injury.

119. After Ryan received the injuries complained of herein as a result of said defective condition of the said OxyContin, notice was give by Ryan to Defendants of the breach of said implied warranty.

120.    As a proximate result of the breach of said implied warranty, Plaintiff sustained the injuries and damages hereinabove set forth.

121.    Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

122.    WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT SIX: BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Hobbs Against All Defendants

123.    Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-122 of the within First Amended Complaint, and makes said paragraphs a part of this, the sixth count, as though fully set forth herein.

124.    Prior to on or about 2001, according to proof, and prior to the time that the said drug, OxyContin, was being used by Ryan, Defendants, and each of them, impliedly warranted to members of the general public, including Ryan, that the said OxyContin was of merchantable quality and safe for the use for which it was intended by the Defendants, namely, for the purpose of pain management.

125.    Plaintiff relied on the skill and judgment of Defendants, and each of them, in the selection, purchase and use of the said OxyContin.

126.    The said OxyContin was not safe for its intended use nor was it of merchantable quality as warranted by Defendants, and each of them, in that it was defectively designed, thereby dangerously exposing the user of said OxyContin and those around it to serious injury.

127.    After Ryan received the injuries complained of herein as a result of said defective condition of the said OxyContin, notice was give by Ryan to Defendants of the breach of said implied warranty.

128.    As a proximate result of the breach of said implied warranty, Ryan sustained the injuries and damages hereinabove set forth.

129.    Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

130.    WHEREFORE, Ryan prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT SEVEN: BREACH OF EXPRESS WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Hobbs Against All Defendants

131.    Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-130 of the within First Amended Complaint.

132.    At all times herein mentioned, prior to on or about 2000 to 2002, according to proof, and prior to the time that the said drug, OxyContin, was being used by Ryan, Defendants, and each of them, utilized advertising media, professional publications and detail persons to urge the use and purchase of the said OxyContin, and expressly warranted to members of the general public, including the Plaintiff herein, that the said OxyContin was effective, proper and safe for its intended use.

133.    Ryan relied upon the said express warranty representations of the Defendants, and each of them, in the purchase and use of said OxyContin.

134.    The said OxyContin was not effective, proper and safe for its intended use as expressly warranted by Defendants, and each of them, in that the said

1
2

OxyContin was defective, thereby causing serious addiction and injury when said OxyContin was being put to its intended use.

3
4
5

135.    Within a reasonable time after discovery that the said OxyContin was defective and unsafe for its intended use, Ryan notified Defendants of the breach of said express warranty.

6
7

136.    As a proximate result of the breach of the said express warranty, Ryan sustained the injuries and damages hereinabove set forth.

8
9
10
11

137.    Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

12
13

138.    WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

14
15

**COUNT EIGHT: STRICT LIABILITY IN TORT**
**Ryan L. Hobbs Against All Defendants**

16
17
18

139.    Plaintiff Ryan L. Hobbs ("Ryan") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-138 of the within First Amended Complaint.

19
20
21
22
23

140.    Defendants, and each of them, manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed and sold a certain OxyContin, which was intended by the Defendants, and each of them, to be used for the purpose of pain management.

24
25

141.    Defendants, and each of them, knew that said OxyContin was to be purchased and used without inspection for defects by Plaintiff and the general public.

26
27
28

142.    The said Oxycontin was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to serious

28
FIRST AMENDED COMPLAINT

injury because of the failure of Defendants, and each of them, to properly guard and protect the users of the said OxyContin from the defective design of said product.

143.    Ryan was not aware of said defects at any time prior to the injuries caused by the said OxyContin.

144.    As a proximate result of the said defects of the said OxyContin, Ryan sustained the injuries and damages hereinabove set forth.

145.    Defendants' acts and omissions were malicious and done with gross negligence, which evidenced a willful, wanton, and reckless disregard for the safety of others, justifying an award of punitive damages in addition to compensatory damages in this matter.

146.    WHEREFORE, Ryan prays judgment against Defendants, and each of them, as hereinafter set forth.

## COUNT NINE: LOSS OF CONSORTIUM
### Michelle Ryan Against All Defendants

147.    Plaintiff Michelle Ryan ("Michelle") realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-146 of the within First Amended Complaint.

148.    Plaintiff Michelle Ryan ("Michelle") and plaintiff's spouse, Ryan L. Hobbs ("Ryan"), are, and at all times herein mentioned were, husband and wife.

149.    As alleged in the Preliminary Allegations and in the First through Eighth Causes of Action, inclusive, Defendants are liable in tort for the injury to Plaintiffs.

150.    Prior to the injuries, Ryan was able to and did perform his duties as a worker in finish cabinetry and carpentry. Subsequent to his addiction and as a proximate result thereof, Ryan has been unable to perform his necessary duties as a spouse, in that he no longer can perform the work and services usually performed by him as a contributor to the income, care, maintenance, and management of the family and the family home. After Ryan became addicted, Michelle lost the loss of the love, companionship, comfort, affection, support, society, solace and moral support of Ryan. In addition, she had to drive Ryan to medical appointments, run errands, shop for

groceries, do all of the cooking and cleaning, manage the home, and care for Ryan and their children.

151.    By reason thereof, Michelle has been deprived of the consortium of her spouse, including the performance of her spouse's necessary duties, all to Michelle's damage.

152.    WHEREFORE, Plaintiff prays judgment against the Defendants, and each of them, as follows:

### COUNT ONE: FRAUDULENT REPRESENTATION
### Ryan L. Hobbs Against All Defendants

1. For Plaintiff's general damages according to proof;

2. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

3. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

4. For Plaintiff's loss of income, wages, and earning potential, according to proof;

5. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

### COUNT TWO: FRAUDULENT CONCEALMENT
### Ryan L. Hobbs Against All Defendants

6. For Plaintiff's general damages according to proof;

7. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

8. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

FIRST AMENDED COMPLAINT

9. For Plaintiff's loss of income, wages, and earning potential, according to proof;

10. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT THREE: PRODUCTS LIABILITY—NEGLIGENCE
### Ryan L. Hobbs Against All Defendants

11. For Plaintiff's general damages according to proof;

12. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

13. For Plaintiff's loss of income, wages, and earning potential, according to proof;

14. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT FOUR: STRICT PRODUCTS LIABILITY: FAILURE TO WARN
### Ryan L. Hobbs Against All Defendants

15. For Plaintiff's general damages according to proof;

16. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

17. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

18. For Plaintiff's loss of income, wages, and earning potential, according to proof;

19. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

FIRST AMENDED COMPLAINT

## COUNT FIVE: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ryan L. Hobbs Against All Defendants

20. For Plaintiff's general damages according to proof;

21. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

22. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

23. For Plaintiff's loss of income, wages, and earning potential, according to proof;

24. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT SIX: BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Hobbs Against All Defendants

25. For Plaintiff's general damages according to proof;

26. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

27. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

28. For Plaintiff's loss of income, wages, and earning potential, according to proof;

29. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

## COUNT SEVEN: BREACH OF EXPRESS WARRANTY OF FITNESS FOR PARTICULAR PURPOSE
### Ryan L. Hobbs Against All Defendants

30. For Plaintiff's general damages according to proof;

31. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

32. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

33. For Plaintiff's loss of income, wages, and earning potential, according to proof;

34. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

### COUNT EIGHT: STRICT LIABILITY IN TORT
**Ryan L. Hobbs Against All Defendants**

35. For Plaintiff's general damages according to proof;

36. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

37. For exemplary and punitive damages as the jury may deem just and proper, in an amount sufficient to punish Defendants and set an example for others;

38. For Plaintiff's loss of income, wages, and earning potential, according to proof;

39. For Plaintiff's medical and related damages according to proof, including the cost of rehabilitation from his addiction to OxyContin;

### COUNT NINE: LOSS OF CONSORTIUM
**Michelle Ryan Against All Defendants**

40. For Plaintiff's general damages according to proof;

41. For compensatory damages within the jurisdiction of this Court in an amount according to proof;

FIRST AMENDED COMPLAINT

42. For Plaintiff's loss of income, wages, and earning potential, according to proof;

## ALL CAUSES OF ACTION

43. For costs of suit herein incurred; and,

44. For such other and further relief as the court may deem proper.

Respectfully submitted,

LAW OFFICES OF RICHARD SAX

Dated: November 2, 2007

By: _____

Richard Sax

Attorney for Plaintiffs,

Ryan L. Hobbs and Michelle Hobbs

## DEMAND FOR JURY TRIAL

Plaintiffs Ryan L. Hobbs and Michelle Hobbs hereby demand a jury trial.

LAW OFFICES OF RICHARD SAX

Dated: November 2, 2007

By: _____

Richard Sax,

Attorney for Plaintiffs, Ryan L. Hobbs and Michelle Hobbs

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

LAW OFFICES OF RICHARD SAX

Dated: November 2, 2007

By: _____

Richard Sax,

Attorney for Plaintiffs, Ryan L. Hobbs and Michelle Hobbs

FIRST AMENDED COMPLAINT