Jay R. Henneberry (State Bar No. 135065)
jhenneberry@chadbourne.com
Robin D. Ball (State Bar No. 159698)
rball@chadbourne.com
CHADBOURNE & PARKE LLP
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90071
Telephone:   (213) 892-1000
Facsimile:   (213) 622-9865

Attorneys for Purdue Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RYAN L. HOBBS and MICHELLE HOBBS,<br><br>Plaintiffs,<br><br>v.<br><br>PURDUE PHARMA COMPANY, et al.,<br><br>Defendants. | Case No. C-07-3854-BZ<br><br>**DECLARATION OF RUSSELL J. GASDIA IN SUPPORT OF STIPULATION AND [PROPOSED] CONSENT PROTECTIVE ORDER** |

I, RUSSELL J. GASDIA, declare as follows:

1.      My name is Russell Gasdia. I am over 21 years of age and am competent in all respects to give the testimony contained herein.

2.      I joined The Purdue Frederick Company ("Purdue Frederick") in 1985. My current title at Purdue Pharma L.P. is Vice President, Sales & Marketing.

3.      In my current job, I am responsible for leading the sales and marketing activities of the organization, which includes oversight of three sales divisions. One of these sales divisions contacts clinicians who are office based, as well as clinicians who are hospital based. The two other sales divisions are responsible for contacting managed care organizations, drug wholesalers, and chain drug stores. My responsibilities also include overseeing training activities of all sales

personnel, development of all marketing plans, and contracting and rebating strategies for both Purdue Frederick and Purdue Pharma L.P. (collectively "Purdue").

4. I make this declaration in support of the parties' Stipulation and [Proposed] Consent Protective Order of Confidentiality. This declaration is based on my personal knowledge of Purdue's policies and practices as augmented by information confirmed by colleagues at Purdue with specific responsibility for human resources, training and marketing functions and workshops, and company security.

### A. Background Information Regarding OxyContin®

5. Purdue is a pharmaceutical company. The company is a leader in the development and marketing of medicine for the treatment of pain. Purdue's most important product is OxyContin® Tablets ("OxyContin®"). OxyContin® is a controlled-release opioid analgesic meaning that the product contains an opioid, oxycodone, and delivers the pain medicine over time (i.e., over a 12 hour period).

6. Drugs have long been used to relieve pain. Pain relieving drugs are called "analgesics." Analgesics can be broadly categorized as opioids, non-opioids and as combination drugs containing both opioid and non-opioid components. Opioids can be natural substances (e.g., morphine), or totally synthetic (e.g., methadone). Opioids may be used to treat moderate-to-severe pain.

7. The Food and Drug Administration ("FDA") approved OxyContin® for use in the United States in December 1995. OxyContin® effectively manages moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. Such pain includes both cancer pain and non-malignant pain. There is a growing body of reports that OxyContin® has dramatically improved the quality of life of people who had been debilitated by chronic pain.

### B. Purdue's Research and Development Efforts

8. Over the years, Purdue has made substantial commitments in support of its research and development of innovative pain therapies, and has researched new therapies for the treatment of pain, including pain from cancer. For instance, at year end 1995, when OxyContin®

was introduced, Purdue employed 151 research and development personnel in the United States. By January 2005, that number had more than doubled to 420. That past research, as well as any continuing research and development efforts by Purdue, remains competitively valuable.

**C.  Measures Taken to Protect Confidential and Highly Confidential Documents Related to OxyContin®**

9. In my position at Purdue I am familiar with the development, testing, manufacturing, and marketing procedures of Purdue as they relate to OxyContin®. I am also familiar with the internal practices employed by Purdue to protect its highly confidential documents.

10. I am familiar with the claims involved in OxyContin®-related product liability lawsuits, which concern, among other things, allegations regarding the design and formulation of OxyContin® and allegations regarding Purdue's "marketing strategy" for OxyContin®.

11. I submit this declaration to describe why certain of Purdue's documents are so proprietary and/or competitively sensitive that their disclosure to Purdue's competitors could cause irreparable competitive injury to Purdue. Specific examples of such highly confidential documents include, but are not limited to, (1) the "Chemistry, Manufacturing and Controls" documents from the New Drug Application ("NDA") for OxyContin®; (2) Study Appendices contained in the NDA and the Investigational New Drug Application ("IND") for OxyContin®; (3) documents related to the current work on reformulation that is not protected by patent; and (4) documents containing current or future marketing and product development plans or discussions of those plans.

12. Purdue, like other pharmaceutical companies, spends millions of dollars each year developing and marketing its products. Those development and marketing efforts are at the heart of the company. Information regarding product development and marketing efforts are trade secrets, and protection of that information is vital to the company's survival. For that reason, Purdue carefully guards its highly confidential information.

13. Purdue's marketing plans and reports for OxyContin® and its product formulas, specifications, recipes and manufacturing processes are not made available to persons outside

Purdue. Purdue does not publish or voluntarily disclose its research and test procedures and methods, or its manufacturing specifications. Similarly, Purdue's marketing plans and reports for OxyContin® that have future applicability and Purdue's marketing plans and reports for its future products are maintained as strictly confidential.

14. Purdue's efforts to maintain the secrecy of its trade secrets and other confidential, proprietary information are ongoing. As a preliminary matter, all Purdue employees, regardless of their position or physical location, are subject to certain company-wide policies that limit dissemination of proprietary and confidential information. As is common in the industry, all Purdue employees sign a confidentiality agreement as a condition of their employment, according to which they agree not to disclose or make use of confidential information learned at Purdue even after their employment with Purdue has ended. The only employees with knowledge of and access to these types of information are those who have a need to know this information by virtue of their work and position at Purdue. All Purdue employees are instructed to safeguard the confidentiality of documents which they may use in their work. Such instructions are contained in employee manuals and periodic memos and directives from management. For example, the Code of Business Ethics for Purdue Pharma L.P. and U.S. Associated Companies (the "Code of Business Ethics"), which is applicable to and distributed to all Purdue employees, instructs all Purdue employees to limit the disclosure of confidential and proprietary information within Purdue only to those individuals with a business need to know the information. It further instructs all employees not to disclose confidential or proprietary information to businesses or individuals outside of Purdue unless there is (1) a business need to know the information and (2) an agreement of confidentiality in place. The Code of Business Ethics also instructs all Purdue employees to report to the General Counsel's office any known instance in which an employee either has disclosed or has been solicited to disclose confidential or proprietary information in a way contrary to the Code of Business Ethics.

15. Purdue also employs additional specific security measures not only at its own facilities, but also at its off-site storage facility, and at off-site workshops and seminars for Purdue's sales force.

16. Within its own facilities, Purdue has taken specific steps to limit access to confidential documents within the company, as a further safeguard to protect against their public dissemination. For example, entrance to all Purdue facilities is restricted to Purdue employees and contract personnel. Non-Purdue persons are admitted only on specific business and are escorted. Visitors must sign a log and be issued security passes. Visitors are not permitted access to record storage areas or work stations where confidential records may be located. Access to certain documents is limited by a responsible records custodian. Sensitive marketing documents are routed to a small number of Purdue employees on limited distribution lists. Some market intelligence, such as sales representative call reports, is stored in a computer database, and only certain employees have access to this information. For example, access to sales representative call reports is only through Administrative Services (except in situations in which such documents have been gathered for litigation purposes, and then these call reports are produced only after entry of an appropriate protective order). Certain medical documents are so sensitive that the documents are numbered and logged; some medical documents require pass-key card access. Certain original research and development documents may not leave Purdue's premises.

17. Purdue also takes steps to protect the secrecy of materials stored by Purdue in its off-site record retention center. Purdue stores some files and documents in a secure, off-site location maintained by an outside vendor. Only four individuals have access to this building, and no unauthorized access is allowed. Even were an unauthorized person to gain access to Purdue's off-site record retention center, the boxes are labeled only according to a non-descriptive numbering system. That numbering system is kept in a card file that is kept locked at night. The information is also maintained in a password-protected computer database that is accessible only to a limited number of individuals at Purdue.

18. Workshops and seminars for sales force and other personnel are held in secure facilities to which only authorized persons are admitted. Each attendee is required to show proper identification upon registration. To gain access to meetings, attendees must display an identification badge. All attendees are advised of the importance of maintaining the information provided at such workshops and seminars in confidence and to take care that any handouts

received or notes they may take at such events are kept confidential and protected from disclosure. At the conclusion of workshops and seminars, facilitators collect all remaining documents and materials before leaving the room.

19. In short, through its company-wide policies and on-site and off-site procedures, Purdue takes reasonable measures to ensure the secrecy of its proprietary and confidential information, regardless of where that information is located.

**D. The Potential Harm to Purdue of Disclosing Its Confidential and Highly Confidential Documents to Its Competitors**

20. The harm to Purdue if its highly confidential documents were disclosed to its competitors would be incalculable. Purdue has made a substantial investment of human resources, capital, facilities, and equipment in developing each of these documents and the issues they discuss. Only by reading and studying Purdue's highly confidential documents -- or by expending financial and human resources over a lengthy period of time -- could other competitors acquire or duplicate the detailed, scientific and commercial information reflected in them. Without access to Purdue's highly confidential documents, some of the valuable information in these documents probably could not be duplicated at all, regardless of the time and resources expended by a competitor. Should these documents be disclosed to a competitor outside of this litigation, that competitor could easily use the information contained in these materials to gain a competitive advantage over Purdue. Such a competitor could do this without compensating Purdue for any of its significant expenses in creating the information contained in these documents. If an outside party obtained these documents, it could develop products to compete with Purdue's products, including OxyContin®, or develop strategies to compete with Purdue in the marketplace. Either scenario would ultimately cause irreparable competitive injury to Purdue.

**(1) "Chemistry, Manufacturing and Controls" Documents from the New Drug Application**

21. Purdue's research and development documents, including but not limited to its product formulas, specifications, recipes and manufacturing processes, are of critical value to the company. Purdue has invested tens of millions of dollars to develop product formulas,

specifications, recipes and manufacturing processes for its existing products, and it continues to spend tens of millions of dollars a year to develop new pain medications and treatments for disease. That investment would be largely lost if disclosed to Purdue's competitors. Further, disclosure of Purdue's highly confidential product formulas, specifications, etc., for future or existing products could assist a competitor in developing a product that would compete directly with OxyContin®. Such a situation would surely result in irreparable competitive injury to Purdue.

22. For example, irreparable competitive harm could result from the disclosure to Purdue's competitors of Purdue's research and development documents regarding OxyContin® or any of its future products. Part of the documents that Purdue will produce to Plaintiffs in response to their discovery requests is the NDA for OxyContin®. The NDA is the submission that every pharmaceutical company must make to the FDA in order to gain the FDA's approval to market a new drug. Although submitted to a federal agency, much of an NDA is not available to the public, even under the Freedom of Information Act ("FOIA"). The NDA for OxyContin® comprises approximately fourteen boxes of documents.

23. Of those fourteen boxes, approximately <u>one</u> box, comprising ten volumes of the NDA, or approximately 3,352 pages, would be designated Highly Confidential. Included in these volumes are the Chemistry, Manufacturing and Controls Documents ("CMC"), which give precise and detailed instructions for the commercial manufacture and testing of OxyContin®. This information is <u>not</u> contained in the patent for OxyContin®, and is not available to the public through FOIA requests. Much of this information would be very difficult, if not impossible, to reverse engineer from OxyContin® Tablets.

24. The information contained in these ten volumes reflects years of research by Purdue to develop procedures to "scale up" the production of OxyContin® to a commercially viable level. In gross terms, the information contained in these ten volumes is the technology and know-how that separate OxyContin® from generic controlled-release oxycodone analgesics.

25. This remains true even as generic controlled-release oxycodone analgesics have entered the market. Purdue has authorized the manufacture and marketing of an authorized

- 7 -
GASDIA DECL. IN SUPPORT OF [PROPOSED] CONSENT PROTECTIVE ORDER
C-07-3854-BZ

generic product that is formulated and manufactured exactly like branded OxyContin® Tablets. Because unauthorized generic products are manufactured without the technology and know-how contained in Purdue's CMC, those unauthorized generic products are not identical to branded OxyContin® Tablets. Consequently, the Highly Confidential information in the CMC remains competitively valuable.

26. If the CMC were disclosed to Purdue's competitors, then a scientist working to develop a time-release formulation for a competing pharmaceutical manufacturer could have direct access to Purdue's most sensitive research on the same topic – information that Purdue has developed at a cost of tens of millions of dollars. Using this information, a competitor could unfairly profit from Purdue's research both before and after the expiration of Purdue's patents for OxyContin®. Before the expiration of Purdue's patents, a competitor could use this information to attempt to design a competing drug that differs just enough from the design of OxyContin® that the competing drug evades the patent protection given to OxyContin®. After the expiration of Purdue's patent for OxyContin®, a competitor could bring to market a generic that is much closer in design and performance to OxyContin® than generic manufacturers can typically achieve, and perhaps years earlier. The potential harm to Purdue, both in terms of copycat design and years of lost revenue, would be incalculable.

**(2) Study Appendices Contained in the New Drug Application and the Investigational New Drug Application**

27. Similarly, Purdue would suffer irreparable competitive harm if the study appendices contained in the NDA and the IND for OxyContin® were disclosed to its competitors. Certain studies performed by Purdue and contained in the NDA and IND consist of two types of documents, study reports and study appendices. A study report contains the overall findings and conclusions of the study. The study appendices would contain all of the raw data that was interpreted by the researchers and that support their conclusions.

28. Purdue seeks only "ordinary" Confidentiality protection for study reports, but has requested that study appendices be designated Highly Confidential. This is because it is much easier for competitors to reverse engineer a pharmaceutical product from the volume of precise

numbers and raw data contained in study appendices, than from the averaged values and conclusions contained in a study report. By performing the identical tests or procedures described in a study on a range of generic samples, and then comparing the results of those tests or procedures against the precise numbers contained in the study appendices, a competitor could chemically "triangulate" with greater precision the manufacturing processes used in Purdue's original study.

29.     Thus, disclosure of Purdue's study appendices in its NDA and IND to its competitors would harm Purdue by allowing its competitors to reverse-engineer information about OxyContin® that they might not otherwise be able to gain by legitimate means.

**(3)   Documents Related to the Current Work on Reformulation That Is Not Protected by Patent**

30.     To date, Purdue estimates an expenditure of more than $200 Million in our efforts to develop more abuse resistant pain medications. This ongoing research includes work to develop an abuse-resistant, agonist-antagonist combination for a controlled release oxycodone analgesic. An antagonist is a chemical (like naloxone or naltrexone) that counteracts the effect of an agonist (like oxycodone). The goal of this research would be to develop a product that releases antagonists when an abuser attempts to disable the controlled-release design -- such as by crushing the tablet -- but not when the tablet is taken as directed by legitimate pain patients.

31.     Despite years of research by both Purdue and, presumably, its competitors, no pharmaceutical company has ever successfully created such an abuse-resistant, agonist-antagonist combination for a controlled release oxycodone analgesic.

32.     Thus, the value of Purdue's ongoing research in this area is incalculable. Indeed, if a competitor were to gain access to this research and then successfully obtain a patent using the same technology before Purdue was able to submit its own patent application, that competitor could deprive Purdue of the use of Purdue's own research for the life of the patent.

///

GASDIA DECL. IN SUPPORT OF [PROPOSED] CONSENT PROTECTIVE ORDER
C-07-3854-BZ

LA1 - 115440.01

**(4)   Documents Containing Current or Future Marketing and Product Development Plans**

33.   Purdue's marketing plans and reports reflect marketing strategies based upon experience, market research, and know-how gained over many years and great expense by Purdue and which cannot be gained by other means.

34.   Such marketing plans describe Purdue's overall strategy for marketing OxyContin® and would detail, for example, Purdue's marketing and advertising strategies, list of objectives, targeted audiences, the types of media on which to focus marketing efforts, and analyses of competitors' products.

35.   Disclosure of these strategies and other marketing information to competitors would incalculably harm Purdue. With this information, a competitor would obtain an invaluable and otherwise unobtainable insight into Purdue's marketing strategy, and be able to allocate its own marketing resources accordingly. The result would be to diminish the overall effectiveness of Purdue's marketing efforts, and immeasurably damage Purdue.

**Conclusion**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on February ___, 2008.

_____
Russell J. Gasdia